UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO. 12-81397 CIV-MARRA/MATTHEWMAN

SUN CAPITAL PARTNERS, INC.

    Plaintiff,

v.

TWIN CITY FIRE INSURANCE COMPANY,

    Defendant,
_____/

**SUN CAPITAL'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO QUASH AND/OR MOTION FOR PROTECTIVE ORDER REGARDING SUBPOENAS RELATED TO THE UNDERLYING LITIGATION [D.E. 56] AND SUBPOENA ISSUED TO HOUSTON CASUALTY COMPANY [D.E. 55]**

Plaintiff, Sun Capital Partners, Inc. ("Sun") pursuant to this Court's Order dated September 22, 2014 [D.E. 68] submits this supplemental briefing in support of its motions to quash and/or for entry of a protective order regarding the subpoenas Twin City ("Twin") issued (1) related to the underlying litigation [D.E. 56] and (2) to Houston Casualty Company ("Houston") [D.E. 55].

**PRELIMINARY STATEMENT**

Twin claims it needs broad and burdensome discovery concerning detailed payment information to "ferret out" an unpleaded "nefarious" scheme involving a "shell" company, apparently practiced by blue-chip investment firms and their well-respected counsel. Twin also claims to need other insurance policies and allocation documentation in order to better understand its own obligations under insurance it and its primary, Houston, sold to Sun. This discovery must either be barred altogether or curtailed for four reasons.

First, and despite Twin's protestations to the contrary, well-settled in-state and national precedent, together with the language of the Houston policy, establish Twin's policy is a liability policy, creating an obligation to pay the moment that Sun became obligated to pay (or incurred

that obligation by becoming obligated to pay). Thus, collaterally sourced funds (which here do not exist) are irrelevant to determine the issue of Twin's breach of its obligations, or, at least initially, the amount of that obligation.

Second, Twin already has ample documentation from which the settlement money trail can be ascertained (and will shortly be receiving even more). At minimum, this documentation would enable Twin to obtain discovery through less intrusive means (depositions) concerning the existence of specific documents which might shed additional light on this frankly irrelevant issue.

Third, under applicable law, the measure of an insurer's obligations and resulting breach of those obligations must uniquely be found in the very policy of insurance which the insurer drafted and sold. It cannot be limned by collateral agreements with other insurers or allocation decisions made by other insurers, whether their policy language is the same or different than Twin's. Because Sun paid a premium for a promise from Twin – not someone else – the decisions made by others (except the Houston primary for exhaustion purposes) are irrelevant.

Last, to the extent either this Court or Twin raise the specter of double recovery (or its evil twin, windfall), this is an issue that can only be resolved after the measure of Twin's obligations are first determined, and then only after considering application of Florida's collateral source rule and Twin's rights under the policy to subrogate against others.

## FACTUAL BACKGROUND

### A. The Policy

Sun purchased a "primary" insurance policy from Houston providing the first layer of coverage and promising to "pay on behalf of the **Insured Organization**[1] **Loss**, which the **Insured Organization** is legally obligated to pay and which arises from any **Claim** first made against the **Insured Organization** during the **Policy Period** for a **Wrongful Act**" [D.E. 1-2, page 2 of 73, section I.C.(3)]. Sun also purchased an "excess" policy from Twin providing coverage above the underlying limit. The Twin "excess" policy "follows form" to the Houston policy, incorporating by reference its terms, conditions, and exclusions [D.E. 1-1, pg. 14 of 19]. The language of the Houston policy ("Policy"), therefore, is central to our inquiry.

The Policy defines **Loss** as:

---

[1] Bold and capitalized terms herein are capitalized and in bold font in the Policies, denoting that they are defined terms in the Policies.

> **Loss** means damages, settlement and **Costs, Charges and Expense** incurred by any of the **Insureds**, including punitive, exemplary or multiplied damages; provided, however, that such punitive, exemplary or multiplied damages are insurable pursuant to any applicable law. (Insurers agree not to contest the application of the law of, or removal of the litigation to, any jurisdiction that may provide for the insurability of punitive, exemplary or multiple damages if such law can be demonstrated as applicable by the Insureds). Loss shall not include:
>
> (1) taxes, criminal or civil fines or penalties imposed by law;
>
> (2) matters deemed uninsurable under the law pursuant to which this Policy shall be construed;
>
> (3) any amounts paid to or on behalf of the **Insured Persons** as indemnification from a **Portfolio Company** under any applicable agreement or as required or permitted by statute, by-laws or charter of the **Portfolio Company**, or any amounts paid to or on behalf of the **Insured Persons** under any insurance coverage provided by the **Portfolio Company**;
>
> (4) any amount allocable to uncovered **Loss** under this Policy; or
>
> (5) the return of any contribution of capital to any **Insured Person.**

[D.E. 1-2, pg. 29 of 73].

The Policy provides that where the insured is named in a lawsuit (which the Policy defines as a **Claim**) that includes an allegation of a breach of some legal duty (a **Wrongful Act**), Twin "pay on behalf of" Sun an amount equal to the amount Sun becomes legally obligated to pay. Section XIV similarly recognizes the insurer's obligation is triggered when Sun's "obligation to pay" is "finally determined…. by written agreement.…" The Policy does not say (though some policies can and do) that Twin or Houston will reimburse Sun for amounts it and no one else pays.

### B. The Mervyn's Settlement

The underlying *Mervyn's* lawsuit filed in September 2008 sought to avoid and recover certain transfers made in connection with the sale of Mervyn's by Target Corporation in 2004, transfers made thereafter during the operation of Mervyn's, and damages for alleged breaches of fiduciary duties by Sun and others. [D.E. 1, pg. 8 of 14]. On October 5, 2012, the *Mervyn's* lawsuit settled for $166 million. **Ex. A**, Settlement Agreement. The one-hundred-and-thirty-page Settlement Agreement between the Debtors, the Committee, and the Defendants, including Sun, reveals the payment arrangement, which was approved by the Court. Despite Twin's innuendo, the Settlement Agreement, rather succinctly, tells what was never a secret:

    C.    Since the filing of the 2004 Transaction Litigation, the Court authorized certain of the 2004 Transaction Litigation Defendants to sell certain real estate that is the subject of the 2004 Transaction Litigation and to hold the net sale proceeds in escrow pending further Court order (the "MDS Sale and Escrow Orders"). Pursuant to the MDS Sale and Escrow Orders, seven real estate properties were sold by certain of the so-called "MDS Entities" (the "MDS Entities"), and the net sale proceeds were deposited into seven separate escrow accounts (the "MDS Escrows").[2]

    1.    <u>Settlement Payment</u>. On the Closing Date (as defined in paragraph 14 below), on behalf of the Defendants, JDA Agent, LLC (the "Defendant Payment Agent"), shall pay, or direct the payment of, the aggregate sum of $166,000,000 (One Hundred Sixty-Six Million) to the Debtors' estates payable as follows: (a) the release of Sun Escrowed Funds to the Debtors' estates; (b) the release of the MDS Escrowed Funds to the Debtors' estates; and (c) cash from the Defendant Payment Agent to the Debtors' estates in an amount to be determined two Business Days prior to the Closing Date (defined below) based upon the amount of the Sun Escrowed Funds, MDS Escrowed Funds . . .

Concurrently with execution of the Settlement Agreement, Sun and the other principal co-defendants executed a "Joint Defense, Common Interest, Expense Allocation, Privilege and Confidentiality Agreement" [D.E. 58, Ex. F[3]], which, among other things, sets forth "sources of funding of the net total settlement amount" and describes the allocation of payment for settlement and costs amongst the signatories to the agreement. Twin is in possession of both documents and had them at the time of the settlement.

## ARGUMENT

**I.  Discovery Regarding "Payment" is Irrelevant as a Matter of Law**

    **A.    The Settlement Agreement Establishes Sun's Legal Obligation**

Twin issued subpoenas claiming that information is needed to "ferret out" who paid the settlement. Because Twin's liability became fixed the moment that Sun was obligated to pay and Twin agreed to pay "on behalf of" Sun regardless of who made the payment, this information is irrelevant. Since "settlement" is included within the definition of **Loss**, the Settlement Agreement created a liability that Sun was legally obligated to pay. *Monticello Ins. Co. v. City of Miami Beach,* No. 06-20459-CIV, 2009 WL 667454, *13 (S.D. Fla. Mar. 11, 2009) (noting "Florida law therefore explicitly provides that liability can be established by a settlement

---

[2] We understand this is common in bankruptcy actions.
[3] This document was filed under seal.

agreement" and explaining "…the word 'liability' means 'the quality or state of being legally obligated or accountable; [a] legal responsibility to another or to society, enforceable by civil remedy or criminal punishment; ... [a] financial or pecuniary obligation.' Black's Law Dictionary (8th ed.2004). Without question, a settlement agreement can give rise to such obligations and responsibilities"); *Gallagher v. Dupont,* 918 So.2d 342, 348 (Fla. 5th DCA 2006) (stating "[w]here […] the insured's liability has been established by the settlement, the insurer may not later relitigate the issue."). Under the terms of the Settlement Agreement, Sun and other Defendants "shall be jointly and severally liable for the Settlement Payment . . ." **Ex. A**, pg. 5.

### B. The Policy Does Not Require "Actual Payment"

The policy that Sun purchased does not require that Sun satisfy its obligation before Twin's liability will attach. Contrary to Twin's contention, this is not "a distinction without a difference." It is a critical and bargained-for difference and one for which Twin charged a particular premium and crafted supporting language. Courts have explained the key difference between a "liability" policy and an "indemnity" policy:

> The function of a liability policy is to shield an insured from being required to make payment on a claim for which he is liable. Under an indemnity contract, the insurer agrees to pay to the insured any sums that the insured has paid or been compelled to pay on a covered claim. The substantive distinction between indemnity and liability policies is that payment of a claim by the insured is a condition precedent to an insured's right to recover under the former, but not the later. (12 M.S. Rhodes, *Couch on Insurance 2d* § 44:250, at 387 (1982).) The liability of an insurer under a liability policy attaches at the time the liability of the insured is fixed for a covered claim; however, the liability of an insurer under an indemnity policy affixes at the time the insured makes payment on a covered claim. (6B J.A. Appleman & J. Appleman, *Insurance Law & Practice* § 4261, at 72 (1979).)

*In re Liquidation of Pine Top Ins. Co.*, 266 Ill. App. 3d 99, 104 (Ill. App. Ct. 1994). This Court has recognized "[i]n analyzing insurance contracts, the timing of an insurer's duty to pay under an insurance policy is a feature that distinguishes a liability policy from an indemnity policy." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Brown*, 787 F. Supp. 1424, 1429 (S.D. Fla. 1991). The *Brown* Court looked to the Third Circuit, which explained:

> In general, under an *indemnity* policy the insurer is obligated only to reimburse the insured for [a] covered loss that the insured himself has already paid. Under a *liability* policy, by contrast, the insurer's obligation to pay arises as soon as the insured incurs liability for the loss; the insured need not pay the loss first.

*Id*. (citing *Little v. MGIC Indem. Corp.,* 836 F.2d 789, 793 (3d Cir.1987)).

Twin seeks to convert this liability policy, which agreed to "pay on behalf of" (not to reimburse) into an indemnity policy. But, that is not the deal that was struck. *Brown*, 787 F. Supp. 1424, 1430 (citing cases and classifying a similar D&O policy as a "liability policy"); *Gon v. First State Ins. Co.*, 871 F.2d 863, 868 (9th Cir. 1989) (discussing a D&O policy and stating "[b]ecause the policy provided coverage for loss that the insureds became legally obligated to pay, rather than loss paid out by the insureds, it was a liability policy").

Twin's puzzling reliance on the term "incurred" found within the policy does not help its cause one whit; the Florida Supreme Court has already spoken as to this issue. In *Ceballo v. Citizens Property Insurance Corporation*, 967 So. 2d 811, 815 (Fla. 2007), the Court stated, "… to 'incur' means to become liable for the expense, but not necessarily to have actually expended it." Thus, this argument is a tautology (or for those versed in mythology, an Ouroboros – the creature which eats itself). Accordingly, as Twin's obligations became fixed at the moment Sun became legally obligated to pay by incurring its obligations under the Settlement Agreement, subsequent events, such as whether that amount was paid by Sun or someone else on its behalf are irrelevant to Twin's duties under this policy. As a result, the discovery that Twin seeks from the non-parties is entirely irrelevant.[4]

### C. Twin Cannot Discharge Its Obligation by Considering Payments Made by Others

Twin assumes that because Sun did not directly pay, Twin is absolved from responsibility, but this is not the law. Where a payment has been made – from any source – that meets a liability incurred by the insured, the liability counts no differently than if the insured had paid the liability itself. *Dawson v. Blue Cross Ass'n*, 366 So. 2d 536, 538 (Fla. 1st DCA 1979) (stating "fact that a relative or friend pays a bill for an insured and does not seek to demand reimbursement does not relieve the insurer of its obligation to pay"); *Strickland v. Fed. Ins. Co.*,

---

[4] The Florida Supreme Court considered an analogous issue in *Camp v. St. Paul Fire & Marine Ins. Co.*, 616 So. 2d 12 (Fla. 1993). In *Camp*, the Court considered whether an insured's bankruptcy and discharge from liability prior to exposure to an excess judgment (such that the insured was never personally liable for the judgment) absolved the insurer of potential bad faith liability under the policy. The Court answered the question "no." *Id*. at 15 (holding that the insurance carrier's liability for bad faith was not extinguished when the insured defendant declared bankruptcy (and was therefore unable to pay) while the underlying personal injury action was pending); *see Whritenour v. Thompson*, 2D13-3434, 2014 WL 2536830 (Fla. 2d DCA 2014) (discussing same).

200 Cal. App. 3d 792, 801 (1988) (quoting *Hughes v. Potomac Ins. Co. of the District of Columbia*, 199 Cal. App. 2d 239, 251 (1962)) ("An insured is entitled to be compensated for loss in precise accordance with the terms of his contract, and his damages are not to be reduced merely because he has collateral contracts or relations with third persons which relieve him wholly or partly from the loss against which the insurance company agreed to indemnify him."); *see also N. Am. Van Lines, Inc. v. Lexington Ins. Co.*, 678 So. 2d 1325 (Fla. 4th DCA 1996); *Fla. Ins. Guar. Ass'n v. Jacques*, 643 So. 2d 101 (Fla. 4th DCA 1994); *Fortune Ins. Co. v. McGhee*, 571 So. 2d 546 (Fla. 2d DCA 1990); *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 105 Cal. Rptr. 3d 200, 207 (Cal. Ct. App. 2010) ("'Where the insured and another defendant are jointly and severally liable for the injury or damage, [a self-insured retention] under the insured's liability policy may be satisfied by payments made by the other defendant or its liability insurer . . . unless the policy clearly provides otherwise.'" (alteration in original) (citation omitted)).

Despite Twin's contention, this would not amount to a "windfall" for Sun, because Sun had a 29.1500% ownership percentage in the MDS and MPC Entities. The term "pay" is not even confined to money; payment can constitute giving something of value, which Sun did. *Sauk County v. Employers Ins. of Wausau*, 240 Wis. 2d 608 (2000); *Earth Elements, Inc. v. National American Ins. Co.*, 41 Cal. App. 4th 110 (1995). Twin also overlooks the windfall that it would receive if the terms of its policy are not enforced. *Lomax v. Nationwide Mut. Ins. Co.*, 964 F.2d 1343, 1347 (3d Cir. 1992) (construing Delaware law) ("If an insurer is allowed to reduce the judgment against it by an amount of collateral benefits paid, insureds will suffer a net loss because they will derive no benefit from the…insurance for which they paid premiums. The insurer, on the other hand, will realize an unwarranted windfall advantage, benefitting from the receipt of premiums and being relieved of the obligation to pay…benefits").

As Florida courts recognize, a contractually obligated party cannot seek to excuse its own breach when substitute performance (payment) derives from a collateral, independent source. *Walker v. Hilliard*, 329 So. 2d 44 (Fla. 1st DCA 1976) (recognizing that the collateral source rule applies in breach of contract cases); *Bangert v. Beeler*, 470 So. 2d 817, 818 (Fla. 1st DCA 1985) (same); *Citizens Prop. Ins. Corp. v. Hamilton*, 43 So. 3d 746, 751 (Fla. 1st DCA 2010) (same).[5]

---

[5] Whether this rule applies to contract actions has spawned an in-state and national division of authority, based in part on public policy and the particular setting in which the rule is sought to be applied. *See Trustees of Cameron-Brown Inv. Group v. Tavormina*, 385 So. 2d 728, 729 (Fla.

The collateral source rule provides that "in a tort or contract action, total or partial compensation received by the plaintiff injured party from a collateral source wholly independent of the defendant wrongdoer will not operate to lessen the damages otherwise due to the plaintiff from the defendant wrongdoer." *Hartnett v. Riveron*, 361 So. 2d 749, 751 (Fla. 3d DCA 1978). The rationale for the rule is to prevent the breaching party from being rewarded when the wronged party's collateral source payment is wholly independent of the breaching party. *Bangert*, 470 So.2d at 818.

While this factually did not here happen (the money paid belonged to Sun because Sun had a 29.1500% beneficial interest in the assets sold to generate such cash), the collateral source rule has both an evidentiary and equitable purpose that illustrates the irrelevance of Twin's discovery. *See Nationwide Mut. Fire Ins. Co. v. Harrell*, 53 So.3d 1084, 1085-87 (Fla. 1st DCA 2010) (discussing evidentiary aspect of the rule); *Hamilton*, 43 So. 3d at 751-52 (addressing application of the rule in a dispute between wind and flood payments); *see also*, *Overton v. U.S.*, 619 F.2d 1299, 1305-08 (8th Cir. 1980) (stating twin purposes of the collateral source rule to include that a wrongdoer should not benefit from the fortuity of a collateral payment, and, as here, the plaintiff (Sun) has contracted for that very result).[6]

### D. The Obligations of an Insurer are Determined by the Policy it Sold, and not by the Decisions, Obligations or Agreements of Others

Under applicable law, the obligations of an insurer are measured by the policy sold, using well-settled rules of insurance policy interpretation. Florida law requires that the coverage provided by the policies be given full force and effect. *See, e.g., Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 537 (Fla. 2005). Florida courts may not rewrite policies, add meaning that is not otherwise present, or reach results contrary to the intentions of the parties.

---

3d DCA 1980); *City of Miami Beach v. Carner*, 579 So. 2d 248 (Fla. 3d DCA 1991). This is a non-issue in this case because payment did not derive from a collateral, independent source. Instead, Sun funded the settlement through, among other things, the court authorized sale of real estate in which Sun had a 29.1500% beneficial interest. In other words, Sun's assets were used to fund its share of the settlement.

[6] Issues of set-off, subrogation, and the potential a third party pay or may be equitably subrogated to recover money paid by it on Sun's behalf from Sun can, if the law and equity permit, lead to a re-allocation or even reduction of payments made or to be made. But these issues are not and may never be before this Court. Rather, we must first determine what Twin contracted to pay on behalf of Sun as a matter of law. Once that obligation and ensuing amount are determined, assuming that Sun itself did not pay (which is not the case), these issues and the potentially significant expense to third parties can be considered.

*Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003) (internal citations omitted).  Insurance policies must be construed in accordance with their plain meaning and read as a whole, giving every provision its full meaning and operative effect.  *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).

Collateral documents or undertakings, unless expressly incorporated by reference in the policy itself cannot be utilized in interpreting (or here limiting) the obligations of the insurer. *Snider v. Cont'l Ins. Co.*, 519 So. 2d 12 (Fla. 5th DCA 1987) (stating collateral agreement "cannot be relied upon to establish provisions of policy; rather it is specific language of policy, not [] agreement, which controls . . . ."); *Infinity Yachts, Inc. v. St. Paul Fire & Marine Ins. Co.*, 655 So. 2d 1259, 1261 (Fla. 4th DCA 1995) (citing *Nat'l Chiropractic Ins. Co. v. Parsons*, 341 So. 2d 220, 221 (Fla. 3d DCA 1976)).  In *Parsons,* the court "reject[ed] the proposition that the expressed provisions of an insurance policy may be changed or amended by an accompanying letter."  *Id*.  The court held, "[w]here unambiguous, the meaning accorded a contract of insurance, like any other contract [] should be limited to its expressed provisions."  *Id.* at 221-22.  This rule is incorporated into the Houston policy at Section XV, the integration clause: "[t]he Insureds agree that this Policy embodies all agreements existing between them and the Insurer…relating to this insurance."  Accordingly, the decisions of other insurers or parties in the *Mervyn's* lawsuit cannot be a basis for either increasing or diminishing Twin's obligations.

Thus, Twin cannot take solace in the decision of another insurer to pay less than what Sun believes is owed (on someone else's insurance policy) any more than Sun can seek to hold Twin to the decisions of other insurers to pay more than what Twin's insurance policy requires it pay.  Therefore, discovery into other insurers' allocation and payment decisions is irrelevant.  Instead, what matters is what Twin agreed to pay and what it should pay assuming an allocation may even be had under the language of the Policy.

**II.      An Alternative to the Subpoenas Exists**

Under the Rule governing protection from discovery, this Court may order that discovery be obtained by less intrusive means. Therefore, Sun proposed that Twin depose key players from the underlying litigation so that Twin can have a dialogue in real time and obtain an explanation concerning the source and nature of any payments, though still irrelevant to its obligations.  Twin has declined this proposal. Instead, Twin seeks to obligate third parties and Sun to spend time and money reviewing and producing cumulative documents that will not inform Twin beyond

what it already knows.  Accordingly, to the extent the Court finds any discovery of this nature should be permitted, a protective order under Rule 26 should be entered because the discovery can be obtained from some other source that is more convenient, less burdensome, and less expensive – knowledgeable people.  FED. R. CIV. P. 26(b)(2)(C)(i).

## CONCLUSION

For the foregoing reasons, the court should grant Sun Capital's motion to quash and/or for entry of a protective order regarding the subpoenas Twin City issued (1) related to the underlying litigation [D.E. 56] and (2) to Houston Casualty Company ("Houston") [D.E. 55].

Respectfully submitted,

**VER PLOEG & LUMPKIN, P.A.**
*Counsel for Plaintiff*
100 S.E. 2nd Street – 30th Floor
Miami, FL  33131-2151
Tel: 305-577-3996
Fax: 305-577-3558


/s/ R. Hugh Lumpkin
**R. Hugh Lumpkin, Esq.**
Florida Bar No. 308196
hlumpkin@vpl-law.com
**Janine Q. Menendez-Aponte, Esq.**
Florida Bar No. 84589
jmenendez-aponte@vpl-law.com
**Christopher T. Kuleba, Esq.**
Florida Bar No. 105302
ckuleba@vpl-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 30, 2014, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List below *via* transmission of Notice of Electronic Filing generated by CM/ECF.

By:  */s/ R. Hugh Lumpkin*
           R. Hugh Lumpkin

## SERVICE LIST

David M. Leonard, Esq.
Catherine Salinas Acree, Esq.
David J. Forestner, Esq.
*Counsel for Twin City Fire*
Carlton Fields Jorden Burt, P.A.
One Atlantic Center
1201 West Peachtree St., Suite 3000
Atlanta, GA 30309
Telephone: 404-815-3380
Fax: 404-815-3415
Email: dleonard@cfjblaw.com
Email: cacree@cfjblaw.com
Email: dforestner@cfjblaw.com
*Via CM/ECF Transmission*

Michael R. Delhagen, Esq.
Courtney E. Scott, Esq.
*Co-Counsel for Twin City Fire*
Tressler LLP
One Penn Plaza, Suite 4701
New York, NY 10119
Telephone: 646-833-0900
Email: mdelhagen@tresslerllp.com
Email: cscott@tresslerllp.com
*Via CM/ECF Transmission*

Joseph Ianno, Jr.
Carlton Fields Jorden Burt, P.A.
*Counsel for Twin City Fire*
525 Okeechobee Blvd.
Suite 1200
West Palm Beach, FL  33401
Phone: 561-659-7070
Fax: 561-659-7368
Email: jianno@cfjblaw.com
*Via CM/ECF Transmission*

217409_1