## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

SUN CAPITAL PARTNERS, INC.

                Plaintiff,

v.

                                    CASE NO. 12-81397-CIV-
                                    MARRA/MATTHEWMAN

TWIN CITY FIRE INSURANCE COMPANY,

                Defendant.

_____/

### SUN CAPITAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

      Plaintiff, Sun Capital Partners, Inc. ("Sun"), pursuant to Federal Rule of Civil Procedure 56, Local Rule 56.1, and this Court's Order dated December 28, 2015 [D.E. 245], moves this Court for entry of an Order granting partial summary judgment in Sun's favor concerning the legal issues described below.

### INTRODUCTION AND BACKGROUND

      This is an action for breach of contract. Twin City Fire Insurance Company ("Twin") has failed to pay a penny of Loss under its excess insurance policy issued to Sun (the "Policy").[1] This action arises from a Claim against Sun, certain Sun affiliates, and numerous other defendants captioned *Mervyn's LLC, et al. v. Sun Capital Partners, Inc., et al.*, No. 08-51402 (Bankr. D. Del. 2008) (the "Underlying Litigation"). Sun's primary insurer, Houston Casualty Company ("HCC"), exhausted its policy limits, triggering Twin's obligations under its Policy, which Twin has declined to honor.

### I.    THE 2004 TRANSACTION

      Sun is a private equity firm that invests in distressed, underperforming, or transitioning companies, using its operational and management expertise to assist the companies' management in improving the companies' productivity, efficiency and profitability. SOF ¶ 26.[2] In September 2004, Sun, Cerberus Capital Management L.P. ("Cerberus"), and Lubert-Adler and Klaff Realty,

---

[1] Throughout this brief, the term "Policy" is intended to refer to the Twin policy and any incorporated terms of the underlying HCC policy. Where the relevant terms of the Twin policy differ and thus preempt the terms of the underlying policy, the distinction will be evident.

[2] Throughout this brief, citations to "SOF" refer to the corresponding paragraph of Sun Capital's Statement of Undisputed Material Facts.

CASE NO. 12-81397-CIV-MARRA/MATTHEWMAN

L.P. ("KLA") (collectively, the "Sponsors") purchased Mervyn's – a discount department store chain – from Target Corporation (the "2004 Transaction"). SOF ¶ 27.  The total purchase price exceeded $1.3 billion. *Id.*

As part of this transaction, the Sponsors separated Mervyn's retail operations from its real estate.[3] SOF ¶ 28.  The Sponsors placed the real estate into newly-formed "MDS Entities"[4] to hold, receive rents from and, where appropriate, dispose of Mervyn's real estate to capitalize on favorable prices. SOF ¶¶ 13, 28.  Mervyn's paid rent to the MDS Entities and continued its retail operations. SOF ¶¶ 13, 28.  Though Sun owned a minority share of the MDS Entities, because of Sun's operational and management expertise, its principal interest was in Mervyn's retail operations. SOF ¶ 30.

Mervyn's was profitable for several years until, due to the great recession, Mervyn's could no longer pay its debts as they came due. SOF ¶ 31.  Though efforts were made to improve Mervyn's performance, the Sponsors were unable to overcome the effects of the recession and sudden loss of credit from Mervyn's principal factor, which itself filed for bankruptcy. SOF ¶¶ 31, 32.  Mervyn's filed for bankruptcy on July 29, 2008. SOF ¶ 32.

## II.    THE UNDERLYING LITIGATION

On September 2, 2008, a committee of Mervyn's unsecured creditors (the "Committee") commenced the Underlying Litigation against 44 defendants, including the Sponsors. SOF ¶ 33. The Committee claimed that the 2004 Transaction and subsequent payments and distributions were either made while Mervyn's was insolvent or rendered Mervyn's insolvent, amounting to actual and constructive fraudulent conveyances and breaches of fiduciary duty. *Id.*  As the case progressed, Sun contends that the Committee focused on its breach of fiduciary duty and constructive fraudulent conveyance claims, largely abandoning its allegations of actual fraud. Thus, the Sponsors' exposure was driven by whether and to what extent Mervyn's was "insolvent" under the Bankruptcy Code on the dates of discrete post-purchase transfers and to what extent damages caused by the bankruptcy filing could be recovered. SOF ¶ 35.

---

[3] "OpCo" continued Mervyn's retail operations. "RealCo" managed Mervyn's real estate. *Id.*

[4] The MDS Entities include: MDS Realty Holdings I, LLC; MDS Realty Holdings II, LLC; MDS Realty I, LLC; MDS Realty II, LLC; MDS Realty III, LLC; MDS Realty IV, LLC; MDS Texas Realty I, LP; MDS Texas Realty II, LP; MDS Texas Realty I, LLC; MDS Texas Realty II, LLC; MDS Texas Properties I, LLC; and MDS Texas Properties II, LLC.    There are also the "MPC Entities," though their form and function are materially the same. SOF ¶ 13.

CASE NO. 12-81397-CIV-MARRA/MATTHEWMAN

### A.  The Joint-Defense

Because the Sponsors were jointly and severally liable for each applicable count of the operative complaint, they believed that the most efficient and cost-effective way to defend the Underlying Litigation was to combine resources and allocate tasks. SOF ¶ 36.  In early 2011, after lengthy discussions concerning the logistics of the defense and the Sponsors' relative exposure to the underlying claims, the Sponsors tentatively agreed to allocate two items of Loss: their joint defense fees (the "Team Fees") and any settlement or judgment in the Underlying Litigation.[5] SOF ¶ 37. Due to conflicts of interest between the Sponsors, Sun maintained its own counsel, Kirkland & Ellis ("K&E"), who primarily handled discovery and ensured that Sun's interests were protected throughout the joint-defense effort. SOF ¶ 38. Twin was made aware of and internally documented the terms of this provisional agreement on April 5, 2011, at the latest, yet did not object until after it consented to the Settlement. SOF ¶ 40.

### B.  The October 5, 2012 Settlement and Joint Defense Agreement

In the early fall of 2012, through discussions spearheaded by and largely confined to Cerberus, settlement amounts potentially agreeable to the other defendants were suggested as acceptable by the Committee. SOF ¶ 40.  On September 25, 2012, Sun arranged a telephone conference with its insurers, including HCC and Twin, to inform them of the prospective terms of this potential settlement, the status of the Team Fees, and to reiterate the anticipated funding sources and how the monies might be allocated. SOF ¶¶ 41, 42.  Sun expressly sought its insurers' consent for Sun's prospective settlement and defense obligation. S.O.F. at ¶ 41.

 On October 3, 2012, Twin consented to the Settlement and defense expenses, and Sun's 15.94% share thereof, stating: "Provided that [Sun] has not already breached the consent to settle provision, Hartford agrees that it will not raise failure to seek consent to settle as a coverage defense." SOF ¶ 43.   On October 5, 2012, Sun, in reliance on the consent given, entered into a global settlement of the Underlying Litigation for $143 million, incurring a joint and several obligation to pay the full amount (the "Settlement"). SOF ¶ 44.  Sun also executed the Joint Defense Agreement, documenting the allocation of the Team Fees and Settlement sum to be paid. *Id.*  The Settlement was funded through two principal sources: (1) money held in escrow by the MDS Entities pursuant to court order and derived from sale of properties (the "MDS

---

[5] Sun, Cerberus, and KLA were tentatively responsible for a 15.94%, 35.34%, and 48.72% share, respectively. SOF ¶ 39.

Escrows") in which Sun held a 29.15% interest and (2) money that was consolidated into the Sponsors' paying agent from various sources (including the MDS Escrows) owned or controlled by the Sponsors. SOF ¶ 46.

While Sun was obligated to pay the entire Settlement sum, pursuant to the Joint Defense Agreement, Sun agreed to pay approximately $37,270,452.58 – comprised of Sun's $21,461,173.19 share of the Settlement, $8,189,441.20 share of the Team Fees, and $7,619,838.18 in individual defense expenses. SOF ¶ 48.  By December 21, 2012, HCC tendered $3,915,008.59 for the Settlement and $5,276,621.76 for K&E fees, thereby exhausting its remaining policy limits and triggering Twin's duty to pay. SOF ¶ 51.  Sun has paid, through the MDS and MPC Entities, $17,546,165.60 in settlement and $10,532,657.62 in defense expenses. *See* SOF ¶¶ 48, 51.  Twin has paid nothing.

### III.   THE POLICY

The Twin Policy has a $10,000,000.00 aggregate limit of liability. SOF ¶ 1.  Twin agreed to provide Sun "with insurance … in excess of the total limits of liability and any retention/deductible under [the HCC Policy]…." SOF ¶¶ 2, 3.  HCC issued its primary policy, HCC Policy No. H707-60661 with an aggregate limit of $10,000,000.00, to Sun for the same policy period (the "HCC Policy"). SOF ¶ 2.

The Twin Policy "follows form" to the HCC Policy, and is therefore "subject to the same representations, terms, conditions, definitions, exclusions and endorsements (except as regards the premium, the amount and limits of liability, and duty to defend, and except as otherwise provided [in the Twin City Policy])." SOF ¶ 4.  Under the Policy, Twin agreed to "pay on behalf of [Sun] **Loss**, which [Sun] is legally obligated to pay and which arises from any **Claim** first made against [Sun] during the **Policy Period** for a **Wrongful Act**." SOF ¶ 14.  The Underlying Litigation is a **Claim** made during the **Policy Period** for an alleged **Wrongful Act**. SOF ¶ 19.

### IV.   CURRENT LITIGATION

The parties have not completed discovery. Accordingly, this motion concerns certain purely legal issues arising from the Policy as informed by basic undisputed facts. First, Twin cannot justify its breach by claiming that Sun did not suffer a monetary loss.  Twin sold Sun a liability policy. A liability policy requires performance by Twin when Sun becomes <u>legally obligated to pay</u>, not when Sun itself pays.  Moreover, under settled law, a payment by a collateral source does not excuse Twin's contractual performance.

CASE NO. 12-81397-CIV-MARRA/MATTHEWMAN

Second, Twin cannot challenge HCC's decision to exhaust its policy or the reasons it assigned for doing so.  While Twin has a right to challenge coverage within its own layer (and Sun has never claimed otherwise), it cannot unring the settlement bell by questioning HCC's decisions as improvident.  Any other result would cause great mischief, as cases would and could never settle, as this litigation itself proves.

Third, where an insurer describes a particular allocation trigger in its policy, it is limited to the right to allocate as described by the provision chosen and sold to the insured.  Twin's Policy does not provide a right to allocate defense expenses where, as here, expenses were incurred in part to defend allegations that purportedly do not constitute "**Loss**."

Last, Twin cannot allocate Sun's already-allocated 15.94% Settlement obligation. Sun paid what it did due to a plenary relative exposure analysis amongst the jointly-liable Sponsors. If allocation is to be permitted, any allocation must be of the full $143,000,000.00 for which Sun was jointly and severally liable as a result of the Settlement; otherwise Twin could double dip on allocation to its sole benefit and in violation of its Policy and applicable law.

## MEMORANDUM OF LAW

### I.    INSURANCE POLICY INTERPRETATION

The interpretation of a contract is a matter of law for the court to decide. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002).  Under New York law, insurance policies are contracts and subject to the ordinary principles of contract interpretation. *In re Estates of Covert*, 761 N.E.2d 571, 576 (N.Y. 2001).   In interpreting an insurance policy, a reviewing court must determine whether – in light of the reasonable expectations of the average insured – the terms, as written, are sufficiently clear and precise such that there is no room for reasonable disagreement about the scope of coverage. *Fed. Ins. Co. v. IBM Corp.* 965 N.E.2d 934, 936 (N.Y. 2012). If there is a reasonable basis for a difference of opinion as to the meaning of a policy term, the term is "ambiguous" and should be interpreted in favor of the insured. *Id.*  If not, the term must be applied as written, either in favor of or against coverage. *Id.* Where a policy exclusion or other coverage limitation is at issue, the provision must be "strictly and narrowly construed, and the insurer bears the burden of demonstrating clearly and unmistakably that the [provision] applies…." *Associated Mut. Ins. v. Bader*, 805 N.Y.S.2d 275 (N.Y. Sup. Ct. 2005); *Cragg v. Allstate Indem. Corp.*, 926 N.Y.S.2d 867, 869-870. (N.Y. 2011).

## II.   TWIN MAY NOT DISCLAIM LIABILITY FOR SETTLEMENT PAYMENTS MADE USING ASSETS HELD BY THE MDS ENTITIES.

Twin claims that it need not pay, regardless of coverage, because someone other than Sun paid.[6]  Twin is wrong.[7]  As a matter of law, whether Sun or anyone else paid the Settlement is irrelevant to Twin's payment obligations.

### A.  Twin Issued A Liability Policy To Sun, Under Which Twin's Obligations Accrue When Sun Becomes *Legally Obligated To Pay* And Without Regard To Whether Sun Itself Pays.

The Twin Policy is a liability policy, not an indemnity policy.  During a hearing on September 19, 2014, Twin's counsel argued that the Twin Policy is an indemnity policy, requiring payment by Twin only when Sun pays out of pocket. *See* D.E. 249-2, September 19, 2014 Hr'g Tr. at 18:22-22:16; 47:10-48:6 ("I would describe [the Twin Policy] as an indemnity policy…. [Twin's duty to pay] would be triggered after [Sun] … provided us documentation [of] the amount that they were required to pay for the settlement, and that they did pay it.").  Twin's monitoring and coverage counsel disagrees. D.E. 249-1, Delhagen Dep. 38:4-7, March 25, 2015 ("Q. Would you characterize the policy that Twin issued to Sun as a professional liability policy? A. Yes.").  Mr. Delhagen is right.  The distinction is relevant to Twin's obligation to pay under the Policy and the injury Sun sustained upon Twin's breach of that obligation. *See In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 464 (S.D.N.Y. 2005).  Under an indemnity policy, an insured must first satisfy a covered loss out of pocket before the insurer is required to pay. *Id.*  In contrast, an insurer's "obligation to pay under a liability policy arises as soon as the insured incurs the liability for the loss," *id.*, and exists "although [the insured] has not suffered actual loss," *Westchester Fire Ins. Co. v. Utica First Ins. Co.*, 40 A.D.3d 978, 981 (N.Y. App. Div. 2007).  The purpose of a liability policy is to provide an insured with peace of mind that, if the insured is confronted with a suit that falls within coverage, the insured will not have to pay judgments, settlements or defense expenses out of its own funds or seek funding from a collateral source. *See generally In re WorldCom, Inc.*, 354 F. Supp. 2d at 465; Allan D. Windt, *Insurance Claims and Disputes: Representation of Insurance Companies & Insureds* §§ 6:5, 6:6 (6th ed.).

---

[6] According to Twin, the MDS Entities that "paid" are non-insured third parties.

[7] The money paid by the MDS Entities on Sun's behalf was Sun's, temporarily held in MDS Escrows pursuant to bankruptcy court order.  Sun concedes that this issue is more appropriately resolved following the conclusion of discovery, and reserves the right to later address this issue if not rendered moot by rulings on this Motion.

CASE NO. 12-81397-CIV-MARRA/MATTHEWMAN

Insurers set different premiums for liability and indemnity policies to account for the insurer's corresponding payment obligations.  Because an insurer's duty to pay under an indemnity policy is contingent on the insured's ability to pay (and actual payment), indemnity policies are far less expensive than their liability counterparts, which require payment without regard to whether the insured actually paid.  Sun paid hundreds of thousands of dollars in premiums to Twin in exchange for a liability policy that requires Twin to "pay on behalf of [Sun] **Loss**, which [Sun] is <u>legally obligated to pay</u>" – not merely **Loss** that Sun first pays. *See* SOF ¶¶ 1, 14 (emphasis added); 7A Couch on Ins. § 103:5 ("An insurance policy is one of liability, rather than indemnity, where it states that the insurer will pay on behalf of the insured all sums which the insured becomes legally obligated to pay....").

Twin's obligation to pay on Sun's behalf therefore accrued on October 5, 2012, when the Settlement and Joint Defense Agreement were fully executed and Sun incurred a legal obligation to pay under those agreements. *See Westchester Fire Ins. Co.*, 40 A.D.3d at 981 ("[The insured's] liability became legally fixed with the execution of the above settlement agreement. This agreement created a legal obligation on [the insured]'s part against which [the insurer] was required to indemnify.").  At that time, Sun was entitled to payment from Twin under its liability Policy without regard to whether Sun paid anything.  Having refused to pay, Twin forced Sun to either fund or violate the Settlement, and may not now avoid its liability to Sun for payments made by third parties on Sun's behalf subsequent to, and as a result of, Twin's breach. [8]

### B. The "Collateral Source" Rule Precludes Twin From Reducing Its Liability By Amounts Paid By Third Parties.

Twin's argument also fails under New York's "collateral source" rule.  Under New York law, a plaintiff in a breach of contract action may recover damages that include amounts for which the plaintiff has already been compensated by a third party where the third party is wholly independent of and collateral to the breaching party. *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 623 n.15 (2d Cir. 2001).  "While the scope of the rule has been limited by statute

---

[8] Twin was informed of the Sponsors' desire to use MDS-held real estate proceeds in which the Sponsors had varying percentages of ownership to fund their respective shares of the settlement in February 2012, at the latest. SOF ¶ 42.  While Twin informed Sun that Twin believed the MDS Entities were not "insureds" under the Policy, Twin did not object to the proposed funding mechanism using Sun-owned, MDS-held real estate proceeds until long after this litigation was commenced.  It must be estopped from doing so now.  Due to the factual nature of this inquiry, Sun intends to address this and other estoppel-based issues following the close of discovery.

such that evidence of third party indemnification may be considered in certain types of tort actions, the rule continues to apply to contract claims." *Ventura Assocs., Inc. v. Int'l Outsourcing Servs., Inc.*, No. 04 CIV. 5962 (PKL), 2005 WL 1634002, at \*6 (S.D.N.Y. July 12, 2005); Joseph M. Perillo, *The Collateral Source Rule in Contract Cases*, 46 San Diego L. Rev. 705, 707 (2009) ("*Perillo*") ("[T]here is no principled distinction in the application of the collateral source rule between contract and tort."). The purpose of the rule is to: (1) discourage parties – such as Twin – from opportunistically breaching a contract by shifting their contractual obligations to unaffiliated third parties; (2) allow an injured party – such as Sun – to receive the benefit of payment from both the breaching party and the unaffiliated collateral source (where applicable); and (3) otherwise prevent the breaching party from being unjustly enriched. *Perillo*, at 707, 711, 716-17; *see, e.g.*, *Ventura Assoc., Inc.*, 2005 WL 1634002 at \*6 ("The fact that Ventura chose to minimize its financial risk through insurance cannot serve to benefit IOS by reducing its potential liability to Ventura.").

In *Hugo Boss Fashions, Inc.*, the Second Circuit (applying New York law) rejected Twin's argument. 252 F.3d at 614.  The insureds, Hugo Boss Fashions, Inc. and Hugo Boss USA (collectively, "HB USA"), sued their insurer, Federal Insurance Company ("Federal") for breach of contract for failing to defend or indemnify HB USA in an underlying trademark infringement suit brought against HB USA and its parent company, Hugo Boss Germany ("HB Germany"). *Id.* at 610. Federal argued that because HB Germany, and not HB USA, paid the defense and settlement expenses incurred in the underlying action, HB USA did not suffer a loss. *Id.* at 614. The Second Circuit disagreed, emphasizing that "[u]nder New York's collateral source rule … a plaintiff may recover damages that include amounts for which the plaintiff has already been compensated through sources wholly independent of and collateral to the wrongdoer." *Id.* Because HB Germany was wholly independent of and collateral to Federal, the court held that "the fact that the parent company, rather than the subsidiary, paid the costs arising out of HB USA's infringing act is of no moment, and HB USA's coverage action lies." *Id.*; *see also Lyman Morse Boatbuilding, Inc. v. N. Assur. Co. of Am.*, No. 2:12-CV-313-DBH, 2014 WL 901445, at \*2 (D. Me. Mar. 6, 2014) (citing *Hugo Boss Fashions, Inc.*, 252 F.3d at 623 n.15).[9]

---

[9] *See, also*, *Miller v. State Farm Mut. Auto. Ins. Co.*, 993 A.2d 1049, 1053 (Del. 2010); *AT&T Corp. v. Clarendon Am. Ins. Co.*, 931 A.2d 409, 421-22 (Del. 2007).

Similarly, Twin is entirely collateral to the MDS Entities, and did not provide consideration for the MDS Entities' "payment" on Sun's behalf.   Instead, Sun paid hundreds of thousands of dollars to Twin for its promise to pay **Loss** on Sun's behalf if Sun became legally obligated to pay such **Loss** – which Sun indisputably has here. Twin may not accept consideration for a contract with Sun, disclaim performance, and proceed to freeload on the benefits Sun purportedly obtained from the MDS Entities for which Twin paid nothing.[10]

Twin may not prevent the application of the collateral source rule by claiming it would result in a double recovery to Sun.   The collateral source rule "is based on the reality that benefits paid by a third party – a collateral source – will amount to a windfall for the plaintiff [insured] if they are not deducted, and for the defendant [insurer] if they are deducted." *Sass v. MTA Bus. Co.*, 6 F. Supp. 3d 238, 255 (E.D.N.Y. 2014).   New York courts applying the collateral source rule have recognized that "[a] double recovery by the plaintiff [insured] is preferable, from a policy perspective, to allowing the defendant [insurer] the benefit of a fund it did not create." *Holder v. Westinghouse Elec. Corp.*, 532 N.Y.S.2d 649, 650 (N.Y. Sup. Ct. 1988); *see also Med. Ctr. of Delaware, Inc. v. Mullins*, 637 A.2d 6, 10 (Del. 1994) ("[T]he collateral source rule resolves what may be competing equities in favor of the innocent injured plaintiff receiving a windfall….").

Regardless, the windfall argument fails, as Sun would not receive a double recovery. First, the funds used by the MDS Entities to fund Sun's portion of the Settlement were Sun's, and, had Twin funded its share of the Settlement, MDS would have paid those funds to Sun instead of the Committee.[11]  *See* SOF ¶¶ 29, 47.   Second, even under Twin's theory that the funds were not Sun's, Sun paid valuable consideration to the MDS Entities to acquire a 29.15% contingent interest in the properties sold. SOF ¶ 30.[12]  Finally, Sun earned the right to coverage under the Policy by paying Twin premiums throughout their multi-year insuring relationship.

---

[10] New York recognizes an exception to the collateral source doctrine under which payments or services provided gratuitously to an injured plaintiff are not to be included in recoverable damages. *Ideal Mut. Ins. Co. v. Korean Reins. Corp.,* 657 F. Supp. 1174, 1175-76 (S.D.N.Y. 1987).  This exception is inapplicable here.

[11] Sun received the net amount of its 29.15% interest in the MDS Entities that exceeded its 15.94% of the Settlement and defense expenses. Sun will address this issue following discovery.

[12] *See generally* Del. Code tit. 6, § 18-501 ("The contribution of a member to a limited liability company may be in cash, property or services rendered, or a promissory note or other obligation to contribute cash or property or to perform services.").

Sun's purported receipt of benefits from the MDS Entities under the first bargain does not make its action for breach of its separate bargain with Twin a bid for a windfall. As courts have recognized, "the collateral source rule does not result in a double recovery in this situation because [the insured] may have paid substantial premiums over a long span of time without ever having received benefits … [which] may, in fact, far exceed the benefits received." *Gormley v. GTE Products Corp.*, 587 So. 2d 455, 457 (Fla. 1991) *superseded by statute as stated in Joerg v. State Farm Mut. Auto. Ins. Co.*, 2015 WL 5995754, at *1 (Fla. Oct. 15, 2015).[13] If Twin is allowed to reduce its obligation by the MDS Entities' "payment" for which Twin paid no consideration, the only resulting windfall would be Twin's.[14]

### C. The MDS Entities are "Insureds" under the Policy.

Twin's argument also fails because the MDS Entities are "**Insured Organizations**" under the Policy. The Policy defines an **Insured Organization** as "any entity formed by the Insured for the sole purpose of performing **Private Equity Activities** on behalf of any entity listed in sections (1) to (3) of this Endorsement." SOF ¶ 6. Sun Capital Partners, Inc., Sun Capital Securities Fund, LP ("SCSF (US)"), and Sun Capital Securities Offshore Fund, LP ("SCSF (OS)") are among the entities listed in sections (1) to (3) of that endorsement. *Id.* **Private Equity Activities** means, in relevant part, "[i]nvestment in … disposition of, or rendering of … administrative or other services to a private equity fund…." SOF ¶ 10. The MDS Entities were formed by Sun and the other Sponsors for the sole purpose of "invest[ing] in [property] … disposi[ng] of [property] … [or] rendering … other services to private equity funds" – namely, SCSF(US) and SCSF(OS). SOF ¶¶ 11, 12 13, 28. Therefore, the MDS Entities are "**Insured Organizations**" under the Policy.

---

[13] *See also Lomax v. Nationwide Mut. Ins. Co.*, 964 F.2d 1343, 1347 (3d Cir. 1992) (construing Delaware law) ("If an insurer is allowed to reduce the judgment against it by an amount of collateral benefits paid, insureds will suffer a net loss because they will derive no benefit from the…insurance for which they paid premiums. The insurer, on the other hand, will realize an unwarranted windfall advantage, benefitting from the receipt of premiums and being relieved of the obligation to pay … benefits").

[14] When Twin issued the Policy, it anticipated that Sun could have rights of recovery from collateral sources for liabilities incurred as a result of a Claim. To account for this possibility, Twin included a subrogation clause, which states, in part, "In the event of any payments under this Policy, the Insurer shall be subrogated to the Insureds' rights of recovery therefor against any person or entity." *See* SOF ¶ 23.

Twin claims that because Sun is a part owner of the MDS Entities, the MDS Entities are "**Portfolio Companies**," and therefore do not constitute "**Insured Organizations**" under the Policy. *See* D.E. 107 at p. 10; SOF ¶ 7 ("[T]he term Insured Organization shall not include any Portfolio Company."). Specifically <u>removed</u> from the definition of "**Portfolio Company**," however, is any "**Insured Organization**:"

> **Portfolio Company** means any corporation, partnership, limited liability company, or other type of organization … (other than an **Insured Organization**) in which one or more **Insured Organization**(**s**) in the past, present or future maintains or had previously maintained or proposed to maintain an equity or debt or convertible security investment … but solely in connection with **Private Equity Activities** by the **Insured Organization**

SOF ¶ 9. Because the MDS Entities are "**Insured Organizations**," they simply cannot be "**Portfolio Companies**." Neither Sun nor HCC – whose policy provisions were adopted by Twin – intended them to be. *See* SOF ¶ 8. The application incorporated into the HCC policy includes a "Schedule of Portfolio Companies." *Id.* The MDS Entities are absent from that list. *See id.* Rather, Sun understood the term "Portfolio Company" to mean the companies in which Sun invested and endeavored to improve, such as Mervyn's, which <u>is</u> listed as a portfolio company in the application. *Id.* Accordingly, the MDS Entities are insureds under the Policy, and Twin cannot escape liability by substituting its insureds' performance for its own.

### III.   THE TWIN POLICY DOES NOT ALLOW TWIN TO ALLOCATE DEFENSE COSTS BETWEEN FRAUDULENT CONVEYANCE AND BREACH OF FIDUCIARY DUTY CLAIMS.

Twin asserts that the principal claims settled in the Underlying Litigation were claims for breach of fiduciary duty and fraudulent conveyance.[15] Twin argues that it owes nothing for the settlement or defense of the fraudulent conveyance claims because those claims are matters deemed uninsurable under New York law, and therefore are not "**Loss**" under the Policy. SOF ¶ 50. As the Policy states:

> **Loss** means damages, settlements, [and defense costs] incurred by any of the **Insureds** …. **Loss** shall not include:
>
> \*   \*   \*
>
> (2) matters deemed uninsurable under the law pursuant to which this Policy shall be construed….

---

[15] Sun agrees that claims sounding in fraudulent conveyance were pleaded, but maintains – as the amount paid in Settlement reflects – these were not the principal claims settled. This will be addressed following the close of discovery.

SOF ¶ 15.  Twin acknowledges that the breach of fiduciary duty allegations are covered **Loss**, but contends that those claims comprised only a fraction of the Settlement and defense expenses, and have already been paid by HCC. *See* SOF ¶ 50.  While Sun contends that Twin's allocation is wrong, Sun acknowledges that a determination of the appropriate settlement liability allocation – a product of Sun's relative exposure to covered **Loss** – involves questions of fact presently unripe for adjudication.  Regarding defense costs, however, Twin's Policy simply does not allow for allocation under the circumstances of this case.

Concerning both defense and settlement expenses paid, Twin may not contest HCC's allocation and resulting policy exhaustion; it may allocate only those amounts that remain for payment.  If Twin is permitted to disregard HCC's payments and re-allocate, it must do so based on Sun's relative exposure to the entire $143,000,000.00 Settlement for which Sun was jointly and severally liable, and may not further allocate Sun's <u>already-allocated</u> 15.94% share.

A. **Defense Expenses**[16]

i. Twin is required to pay all remaining defense expenses reasonably and necessarily incurred in the defense of a "**Claim**."

Twin cannot allocate defense expenses between covered and uncovered counts where, as here, the Policy provides that (1) the insurer must advance defense expenses for any "**Claim**" against the Insured and (2) "**Claim**" is defined to mean the entire lawsuit.

In *Julio & Sons*, the court acknowledged the distinction between a carrier's contractual duty to defend a "**Claim**" (defined as a civil proceeding) and a claim (undefined) – the latter potentially allowing the insurer to parse between the individual claims (counts) within a civil proceeding, while the former plainly not:

> Travelers argues [that] the policy provides coverage on a claim-by-claim basis, where 'claim' is assumed to be a cause of action, such as breach of contract or negligence … [The insured] respond[s] by noting that the policy defines '[C]laim' as a 'civil proceeding'…. Under this interpretation … an exclusion would bar … [coverage] only if one or more exclusions **applied to the entire lawsuit**.  Perhaps in the absence of the policy's definition of the word '[C]laim,' it would be a closer question….  The policy's definition of the word '[C]laim,' however, clearly contemplates the equivalence of the word '[C]laim with the word as the insured properly suggest[s]….  [T]he Court rejects Travelers argument….

---

[16] The term "defense expenses" refers to "**Costs, Charges and Expenses**," defined by the Policy to mean "reasonable and necessary legal fees and expenses (including expert fees)…."  SOF ¶16.

*See Julio & Sons Co. v. Travelers Cas. & Sur. Co.*, No. 08 CV 3001 (RJH), slip op. at *7 (S.D.N.Y. Feb. 13, 2009) (emphasis added).[17]

As in *Julio & Sons*, the Policy obligates Twin to pay for all "reasonable and necessary legal fees and expenses (including expert fees) … incurred by **Insureds** in the investigation or defense of any **Claim**," defined to mean "any … civil [or] judicial proceeding … initiated against [Sun]." SOF ¶¶ 14-17. By agreeing to pay for all defense expenses incurred in the defense of any civil or judicial proceeding, Twin agreed to pay for all defense expenses incurred in that proceeding unless one or more coverage exclusions or limitations apply to the entire proceeding. *Julio & Sons*, No. 08 CV 3001 at *7. It is undisputed that no coverage exclusions or limitations apply to the entire Underlying Litigation. Accordingly, Twin is obligated to pay for Sun's reasonable defense expenses incurred defending the Underlying Litigation in its entirety, and may not parse its obligation based on the individual counts asserted therein.

ii. The Policy contemplates allocation of defense costs incurred for covered and uncovered "**Loss**," but not allocation of counts that do not constitute "**Loss**" at all.

Twin also cannot allocate defense expenses because the Policy's limited allocation provisions only contemplate allocation of **Costs, Charges and Expenses** between those incurred for a covered "**Loss**" and those incurred for an uncovered (i.e. *excluded*) "**Loss**":

**VII. ALLOCATION**

If there can be an agreement on Costs, Charges and Expenses, the Insurer shall advance on a current basis Costs, Charges and Expenses allocated to covered **Loss**. If there can be no agreement on an allocation of **Loss**:

\* \* \*

Any negotiated, arbitrated or judicially determined allocation of Costs, Charges and Expenses on account of a **Claim** shall be applied retroactively to all Costs, Charges and Expenses on account of such **Claim**….

\* \* \*

---

[17] A copy of *Julio & Sons* is attached as Exhibit 1 to this Motion. The *Julio & Sons* court held Texas law applicable, but the principles cited by the court in support of the above proposition are the same under both New York and Texas law. *Compare Julio & Son's*, No. 08 CV 3001 at *5-7 ("Because … ambiguities must be resolved in favor of the insured, the court rejects Travelers' argument … and finds that the policy provides for advancement of defense expenses for all the claims against defendants.") *with CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 77, 83 (2d Cir. 2013) ("[A]mbiguous [language] … [is] interpreted in favor of the insured…. [W]here several claims arise from the same set of facts, if any of the claims are covered by the policy, the insurer … has a duty to defend the entire action … including the uncovered claims.").

> **Loss** means damages, settlements and Costs, Charges and Expenses … [but] **Loss** shall not include … any amount allocable to <u>uncovered **Loss**</u>[18] under this Policy.

SOF ¶¶ 15, 16, 18 (emphasis and footnote added).  First, this language makes no sense.  If defense expenses are "**Loss**," they do not suddenly cease to be "**Loss**" if something else is excluded.  Second, to be allocable, the claim for which those Costs, Charges, and Expenses were incurred must fall within the Policy's definition of "**Loss**." Where one of the counts for which the insured incurred Costs, Charges and Expenses constitutes "**Loss**" and the others do not, the Policy does not permit allocation between those counts.  *See Barney Greengrass, Inc. v. Lumbermans Mut. Cas. Co.*, No. 09 CIV. 7697, 2010 WL 3069560, at *8 (S.D.N.Y. July 27, 2010) ("It is well-settled that any ambiguity resulting from [an] omission must be construed against the insurer."); *Clifford Chance LLP v. Indian Harbor Ins. Co.*, No. 602862/05, 2006 WL 3821841, at *3 (N.Y. Sup. Ct. December 27, 2006) ("Costs and attorneys' fees … that fall within the definition of '**Loss**' under the Policy are … subject to allocation."). Twin contends that the fraudulent conveyance counts are not **Loss** at all.[19] SOF ¶ 50.  Therefore, the Policy fails to provide for allocation of the Costs, Charges, and Expenses at issue here.

By committing the subject of when and how to allocate to contract, Twin cannot seek to utilize materially different and more restrictive allocation language of which it was aware, but chose not to incorporate into its Policy. *See Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1115 (9th Cir. 2006) (allowing Twin to allocate between breach of fiduciary duty claims constituting "**Loss**" and fraudulent conveyance claims carved out from the definition of "**Loss**" where its policy permitted allocation between "covered **Loss** and uncovered loss [undefined]"); *Gen. Star Indem. Co. v. Driven Sports, Inc.*, 80 F. Supp. 3d 442, 460-61 (E.D.N.Y. 2015) ("[T]his was the provision in which [the insurer] could have contracted for a right to seek recoupment, but it did not do so. This Court is obliged, under New York law, to interpret the Policy as it is written in keeping with an average insured's reasonable expectations."); *Shoshone First Bank v. Pac. Emp'rs Ins. Co.*, 2 P.3d 510, 514 (Wyo. 2000)

---

[18] Because "uncovered **Loss**" necessarily requires the existence of a **Loss**, "uncovered **Loss**" must mean "**Loss**" subject to an enumerated exclusion under the Policy.

[19] Sun disagrees with Twin's contention that the amounts Sun paid settling and defending the fraudulent conveyance claims are not covered under its Policy, but does not believe that issue can be addressed at this time.  Regardless, Twin cannot allocate defense expenses attributable to these claims under the facts, law, or Policy at issue.

("[The insurer's] failure to treat … the allocation of defense costs in the policy results in an assumption by the insured that [the insurer] will pay the full cost of the defense.").[20] Indeed, the Policy's "Entire Agreement" provision provides that "th[e] Policy embodies all agreements existing between [Sun] and [Twin] … relating to this insurance." SOF ¶ 25.  Twin may not now add language to defeat coverage.[21]

### B. Twin May Not Further Allocate Sun's Already-Allocated 15.94% Share of the Settlement or Defense Expenses.

Sun became legally obligated to pay the full $143,000,000.00 Settlement. SOF ¶¶ 44, 48. Sun's 15.94% allocation was documented in the contemporaneously-executed Joint Defense Agreement. SOF ¶¶ 44, 45.  If another Sponsor failed to pay its share of the $143,000,000.00 Settlement, Sun would be legally obligated to pay that amount. SOF ¶¶ 44, 45.

Twin believes that the allocation methodology known as the "Relative Exposure Rule" will operate to reduce its liability for Sun's 15.94% share of the Settlement.  If Twin is permitted to allocate, however, it must not be permitted to allocate based on Sun's 15.94% share of the Settlement agreed to among the Sponsors, but must instead allocate based on Sun's relative exposure to the full $143,000,000.00 Settlement for which Sun was jointly and severally liable.

Sun's 15.94% share resulted from a plenary analysis of Sun's relative exposure by the Sponsors – the parties with the most knowledge of their individual exposure and incentive to bargain for an appropriate and reasonable allocation reflecting that exposure.  *See* SOF ¶¶ 30, 35, 37.  Of the three Sponsors, Sun paid (by a large margin) a minority share of the Settlement and Team Fees following an evaluation of the Sponsors' relative exposures based in part on ownership interests as of the dates of various transactions and the claims made.  *See* SOF ¶¶ 26, 30, 35, 37, 48.  Twin may not further reduce Sun's already-allocated Settlement liability. If Twin is permitted to allocate at all, it should be required to allocate based on Sun's joint and several liability for the full $143,000,000.00 Settlement and $48,017,838.18 in total defense expenses,

---

[20] *See, e.g., Camelback Props. v. Phoenix Ins. Co.*, No. 10 CV 01467, 2013 WL 1568517, at *3 (N.D. Ill. Apr. 12, 2013) ("If the parties had intended … allocat[ion] by a pro-rata share they could have included that language in the policy….").

[21] The defense costs are also not allocable due to New York's application of the "inextricably intertwined" rule, precluding allocation where it is impractical. *See, e.g.*, *Trs. of Princeton Univ. v. Nat'l Union Fire Ins. Co.*, No. 650202/06, 2007 WL 1063870, at *5-6 (N.Y. Sup. Ct. April 10, 2007); *Regis Radio Corp. v. Am. Emp. Ins. Co.*, 30 Misc. 2d 341, 344 (N.Y. Sup. Ct. 1961). This issue, however, will be argued, if necessary, following resolution of the issues addressed in this Motion, and after completion of pertinent discovery.

not the pre-allocated 15.94% share for which Sun now seeks coverage.  To do otherwise amounts to a double-dip by Twin.

### IV.   TWIN MAY NOT CHALLENGE HCC'S GOOD FAITH EXHAUSTION OF ITS PRIMARY POLICY LIMITS.

Twin claims that its Policy has not yet been triggered because HCC inappropriately exhausted its policy on uncovered counts, thus creating a gap which must be bridged by Sun before Twin's Policy has to respond.[22] *See* SOF ¶ 50; D.E. 249-1, Delhagen Dep. at 183:7-11.  Under the Policy and New York law, however, HCC's good faith exhaustion is binding on Twin.

### A.   The Twin Policy Expressly Provides That HCC May Exhaust Its Policy By Payment Of Any Type of Loss Incurred By Sun.

Twin's argument that the HCC policy limits are not exhausted because HCC paid for fraudulent conveyance claims, which constitute loss (but not **Loss**) similarly fails under the language of Twin's own Policy.  Twin's Policy states that "[i]n the event of the reduction or exhaustion of the aggregate limits of liability under the [HCC] Policy[] **by reason of losses paid thereunder** … [the Twin Policy] shall … in the event of exhaustion, continue in force as primary insurance, subject to [Twin's] Limit of Liability and to the other terms, conditions and exclusions of this policy…." SOF ¶ 3 (emphasis added).  The term "losses" as used in this provision is undefined.  By choosing to use the term "losses" instead of "**Loss**" in its exhaustion provision, Twin agreed that its obligations are triggered when the HCC policy is reduced or exhausted by losses of whatever nature incurred by Sun and paid by HCC, without regard to whether those losses constitute "**Loss**" or might otherwise be excluded under the Policy.  At best, the Twin Policy is ambiguous with respect to whether HCC may exhaust its policy by paying for loss but not **Loss**, and the provision must be construed in Sun's favor.

If the Court rejects Twin's "MDS payment" argument and finds that Sun suffered a monetary loss paid in part by HCC, then Twin should not be permitted to contest HCC's allocation and resulting exhaustion.  Because the Twin Policy states that "in the event of exhaustion, [the Twin Policy] shall continue in force … subject to … the other terms, conditions and exclusions of th[e] [Twin Policy]," SOF ¶ 3, Twin may allocate, if at all, only amounts unreimbursed within Twin's coverage layer.

---

[22] Even assuming Twin is correct (and it is not), the gap (if any) that needs to be bridged has already been satisfied by Sun.  Between Sun's 15.94% share of Settlement and defense expenses, Sun incurred $37,270,452.58 in covered losses, only $9,191,629.35 of which was paid by HCC.

CASE NO. 12-81397-CIV-MARRA/MATTHEWMAN

**B.  New York Law Prohibits Twin From Contesting HCC's Good Faith Exhaustion.**

Consistent with the plain language of the Twin Policy, New York law holds that an excess carrier is bound by a primary insurer's good faith decision on exhaustion, and may not contest whether the primary exhausted through payment of covered or uncovered matters. *See U.S. Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp. 2d 77, 106-107 (S.D.N.Y. 1999); *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 853 F. Supp. 98, 101 (S.D.N.Y. 1994).[23]

In *Treadwell Corp.*, the insured, Treadwell, was subject to substantial liability for asbestos-related claims spanning from the 1940s through the 1990s. 58 F. Supp. 2d at 81-82.  In an effort to resolve the coverage disputes with its carriers, Treadwell entered into a settlement agreement with three primary insurers, under which the insurers agreed to allocate their respective liability in proportion to their relative time on the risk from 1967-1986. *Id.* at 105-07. U.S. Fire was an excess insurer on the risk for the 1970, 1971, and 1972 policy periods for amounts in excess of the underlying "AMLIC" [24] primary policy. *Id*. at 82.

AMLIC settled with Treadwell for $475,000. *Id.* at 106.  Treadwell argued that AMLIC's payment should be allocated to its 1970, 1971, and 1972 policy periods – the periods it contractually agreed to cover. *Id*.  U.S. Fire argued that AMLIC's payment should be apportioned not only across its 1970, 1971, and 1972 policy periods, but all policy periods for which Treadwell was uninsured. *Id.* at 106-07.  The court disagreed, emphasizing that "treating a primary insurer's settlement with an insured as binding for allocation purposes, at least in the absence of evidence of collusion to defraud an excess insurer, furthers the strong public interest in promoting settlement." *Id.* at 88 n.11, 107, 108-109 ("Under New York law … the excess policy is triggered when aggregate payments by the primary insurer … exceed the underlying policy's liability limits."); *see also E.R. Squibb & Sons, Inc.*, 853 F. Supp. at 101 (same); *Maryland Cas. Co. v. W.R. Grace & Co.*, No. 88 CIV. 2613 (JSM), 1996 WL 109068, at *12 (S.D.N.Y. Mar. 12, 1996) ("Insurers contract to cover a particular period. If they settle before a final determination as to whether or not the injury actually or reasonably occurred within that period and it is later shown that the injury in fact occurred outside of the policy period, the

---

[23] *See generally Mount Vernon Fire Ins. Co. v. Travelers Indem. Co.*, 393 N.E.2d 974 (N.Y. 1979) (holding that a follow-form excess carrier could not invoke a clause in the primary policy to gain for itself an exemption to which the primary insurer was not entitled).

[24] AMLIC was insolvent, and taken over by the New York Superintendent of Insurance as ancillary receiver for AMLIC. *Id.* at 85.

settlement amount is still allocated to the period that the settling insurer contracted to cover."); *Anita Foundations Inc. v. ILGWU Nat. Ret. Fund*, 710 F. Supp. 983, 987 (S.D.N.Y. 1989) (recognizing that "a settlement payment, made when the law was uncertain, cannot be successfully attacked on the basis of any subsequent resolution of the uncertainty ... [o]therwise the public policy of encouraging settlements would be seriously undermined") (quotations omitted).[25]  Because there was no collusion between Treadwell and its primary insurer, the court held that the excess carrier was bound by the primary carrier's decision on allocation and the resulting exhaustion.[26]

Here, HCC in good faith agreed to an allocation of 25% for settlement and 100% of Sun's individual defense expenses, exhausting the HCC policy and triggering Twin's obligation to provide coverage for its share of Sun's approximately $28,078,823.23 in remaining settlement and defense expenses. SOF ¶¶ 1, 2, 3, 51. Twin, much like the excess carrier in *Treadwell*, claims that HCC did not exhaust because it paid more than it should have.  Under *Treadwell*, however, Twin cannot dispute that HCC's payment represented a good-faith allocation and exhaustion of its policy.  Had Twin elected to include language in its contract with Sun allowing it to contest HCC's decisions on allocation and exhaustion, the result might be different.  In the absence of such language, however, Twin may not now seek to imply a contractual limitation on coverage to reduce its liability at Sun's expense.[27]

---

[25] *See also Edward E. Gillen Co. v. Ins. Co. of the State of Pennsylvania*, No. 10-C-564, 2011 WL 1694431, at *4 (E.D. Wis. May 3, 2011) ("[A]n excess liability insurer cannot avoid or reduce liability under its own policy by challenging a separate insurer's decision to settle or pay out claims at a prior layer of insurance…. An excess liability insurer, particularly a 'follow-form' insurer, assumes the risk that the primary insurer will adjust claims in a certain manner and in such a way that triggers the potential for liability … under the excess policy.").

[26] In *CNL Hotels & Resorts v. Twin City Fire Insurance Company*, 291 F. App'x 220 (11th Cir. 2008), the roles were reversed; Twin was the exhausting primary and HCC was the recalcitrant excess. While the Court applied New York law to find that the stock price differential and attorney fee amounts paid were not covered – and they clearly were not – (and thus Twin did not exhaust), neither the policy language pertaining to exhaustion, whether HCC consented to the settlement as Twin did here, nor the impact of *Treadwell* and its progeny were addressed in the opinion. A review of the appellate briefs confirms little attention was paid to these issues, which are best resolved by a study of New York law itself.

[27] Although the caselaw on this issue in the primary and excess insurance context is sparse, the strong public policy underlying the results in *Treadwell*, *E.R. Squibb*, and *W.R. Grace*, has driven analogous outcomes in other contexts.  For example, in the reinsurance context, the "follow the fortunes" doctrine binds a reinsurer to the coverage and allocation decisions of the

## V.   THE TWIN POLICY REQUIRES SUN TO OBTAIN TWIN'S CONSENT ONLY FOR SETTLEMENTS MADE.

Twin also contends that it owes nothing to Sun because Sun entered into "settlements" regarding those matters before obtaining Twin's consent.   Twin argues that the tentative agreement in principle to settle the Underlying Litigation on September 7, 2012, constitutes a "settlement" requiring Twin's consent under its Policy. *See* SOF ¶ 50. Similarly, Twin contends that Sun's tentative agreement in principle with the Sponsors to pay 15.94% of any settlement and the Team Fees amounts to a separate settlement made before Twin gave its consent. *See id.* Twin is mistaken.

Twin relies on the HCC Policy's consent, cooperation, and voluntary payments provision in an attempt to sidestep its obligation to Sun. *Id.*   While the HCC Policy governs many aspects of the parties' insuring agreement, it does not govern the consent, cooperation and voluntary payment issues.   The Twin Policy speaks to, and therefore governs, those subjects. SOF ¶ 4 ("This policy is subject to the same representations, terms, conditions, definitions, exclusions and endorsements (… except as otherwise provided herein) as are contained in or as may be added to the [HCC] Policy"); *see also Tscherne v. Nationwide Mut. Ins. Co.*, No. 81620, 2003 WL 22724630, at *4 (Ohio Ct. App. November 20, 2003) ("To the extent the language of a primary policy and a following form excess policy differ, the terms of the excess policy control where the excess coverage is implicated").

The Twin Policy states that "[n]o costs, charges or expenses for investigation or defense of claims shall be incurred, or **settlements made**, without [Twin's] written consent, such consent not to be unreasonably withheld."  SOF ¶ 24 (emphasis added).  To prevail, Twin must thread an eyeless needle, because on October 3, 2012, Twin consented to the settlement unless Sun had

---

ceding insurer as long as the ceding insurer's decisions were reasonable and made in good faith. *See Travelers Cas. & Sur. Co. v. Gerling Glob. Reinsurance Corp. of Am.*, 419 F.3d 181, 188-90 (2d Cir. 2005) ("[W]e decline to authorize an inquiry into the propriety of a cedent's method of allocating a settlement if the settlement itself was in good faith, reasonable, and within the terms of the policies."); *N. River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 140-41 (2d Cir. 2004) ("[T]he main rationale for the doctrine is to foster the goals of maximum coverage and settlement and to prevent courts, through de novo review of [the cedent's] decision-making process, from undermining the foundation of the cedent-reinsurer relationship.").  Similarly, where an insurer wrongfully refuses to defend or settle an underlying claim against its insured, the insured is entitled to enter into a settlement agreement with the plaintiff, which is binding on the insurer as long as it is both reasonable and made in good faith. *See, e.g.*, *PB Americas Inc. v. Cont'l Cas. Co.*, 690 F. Supp. 2d 242, 250 (S.D.N.Y. 2010).

earlier breached the consent provision. SOF ¶ 43.  Thus, it must prove that a binding obligation to pay existed before the September 25, 2012 conference call during which Sun explained the provisional settlement framework to Twin and requested Twin's consent.  Sun did not incur a legal obligation to pay the Settlement or Team Fees until October 5, 2012[28], however, and Twin's "lack-of-consent" defense therefore fails as a matter of law. *See* SOF ¶¶ 44, 45, 48, 49.

Until Sun executed the Settlement and Joint Defense Agreement, no settlement was "made" and no Team Fees were "incurred." *See* Black's Law Dictionary (10th ed. 2014) (defining "to make" to mean "[t]o legally perform, as by executing, signing, or delivering (a document) <to make a contract>"); *Westchester Fire Ins. Co.*, 40 A.D.3d at 981 ("[An insured's] liability bec[omes] legally fixed with the execution of … [a] settlement agreement."); *Town of New Windsor v. Tesa Tuck, Inc.*, 935 F. Supp. 317, 320 n.3 (S.D.N.Y. 1996) (recognizing that to "incur" means "[t]o become liable for"). By then, Twin had already given its consent and agreed it would "not raise failure to seek consent as a coverage defense." *See* SOF ¶¶ 43, 44, 45.  New York law is in accord. *See Vigilant Ins. Co. v. Bear Stearns Companies, Inc.*, 884 N.E.2d 1044, 1046 (N.Y. 2008) (holding that the insured's execution of a final settlement agreement – but not the previously agreed-upon settlement-in-principle – violated a materially similar consent provision).

Here, it is undisputed that Sun did not execute or otherwise agree to be legally bound by any agreement settling the Underlying Litigation or obligating Sun to pay 15.94% of any settlement and Team Fees until after Twin agreed it would "not raise failure to seek consent to settle as a coverage defense." *See* SOF ¶¶ 43, 44, 45.  Although settlement negotiations led to a tentative agreement in principle before Twin agreed not to raise consent as a defense to coverage, that agreement was not enforceable and was subject to several material contingencies, including: (1) mutually acceptable definitive documentation reflecting all agreed-upon and yet-to-be-agreed-upon material terms; (2) court approval; and (3) approval of all defendants, including Sun, and their carriers. *See* SOF ¶ 40.  Moreover, several drafts were exchanged and modified before the agreements were executed on October 5, 2012. *Id.* As the court in *Clark v. Gotham Lasic, PLLC*, recognized, such agreements in principle are of "little significance" where settlement terms remain for agreement. No. 11 CIV. 1307 BSJ JCF, 2012 WL 987476, at *3

---

[28] Arguably, Sun did not incur a legal obligation to pay the Settlement until November 2, 2012, when the Settlement was approved by the bankruptcy court. *See* SOF ¶ 49.

CASE NO. 12-81397-CIV-MARRA/MATTHEWMAN

(S.D.N.Y. Mar. 2, 2012).   Therefore Sun's tentative agreements in principle to settle the Underlying Litigation and pay 15.94% of the Team Fees did not violate the Policy's consent provision, which requires Twin's consent only where those settlements are actually made.

## CONCLUSION

For the foregoing reasons, Sun Capital's Motion for Partial Summary Judgment should be granted.

Respectfully submitted,

**VER PLOEG & LUMPKIN, P.A.**
*Counsel for Plaintiff*
100 S.E. 2nd Street – 30th Floor
Miami, FL  33131-2151
Tel: 305-577-3996
Fax: 305-577-3558


*/s/R. Hugh Lumpkin*
**R. Hugh Lumpkin, Esq.**
Florida Bar No. 308196
hlumpkin@vpl-law.com
**Arya Attari, Esq.**
Florida Bar No. 58847
aattari@vpl-law.com
**Christopher T. Kuleba, Esq.**
Florida Bar No. 105302
ckuleba@vpl-law.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 19, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List *via* transmission of Notice of Electronic Filing generated by CM/ECF.


By: */s/R. Hugh Lumpkin*
      R. Hugh Lumpkin

CASE NO. 12-81397-CIV-MARRA/MATTHEWMAN

## <u>SERVICE LIST</u>

*Sun Capital Partners, Inc. v. Twin City Fire Insurance Co.*
CASE NO. 12-81397 CIV-MARRA/MATTHEWMAN

David M. Leonard, Esq.
David J. Forestner, Esq.
*Counsel for Twin City Fire*
Carlton Fields Jorden Burt, P.A.
One Atlantic Center
1201 West Peachtree St., Suite 3000
Atlanta, GA 30309
Telephone: 404-815-3380
Fax: 404-815-3415
Email: dleonard@cfjblaw.com
Email: dforestner@cfjblaw.com
*Via CM/ECF Transmission*

Michael R. Delhagen, Esq.
Courtney E. Scott, Esq.
*Co-Counsel for Twin City Fire*
Tressler LLP
One Penn Plaza, Suite 4701
New York, NY 10119
Telephone: 646-833-0900
Email: mdelhagen@tresslerllp.com
Email: cscott@tresslerllp.com
*Via CM/ECF Transmission*

Joseph Ianno, Jr.
Carlton Fields Jorden Burt, P.A.
*Counsel for Twin City Fire*
525 Okeechobee Blvd.
Suite 1200
West Palm Beach, FL  33401
Telephone: 561-659-7070
Fax: 561-659-7368
Email: jianno@cfjblaw.com
*Via CM/ECF Transmission*