# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## WEST PALM BEACH DIVISION

### CASE NO. 12-81397-CIV-MARRA/MATTHEWMAN

SUN CAPITAL PARTNERS, INC.,

   *Plaintiff*,

v.

TWIN CITY FIRE INSURANCE
COMPANY,

   *Defendant.*

_____

## TWIN CITY'S FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON INDEMNITY FOR SUN'S CLAIMED SETTLEMENT PAYMENT

Joseph Ianno, Jr.
Florida Bar No. 655351
CARLTON FIELDS JORDEN BURT, P.A.
CityPlace Tower
525 Okeechobee Boulevard
Suite 1200
West Palm Beach, Florida  33401
Telephone: (561) 659-7070
Facsimile: (561) 659-7368
Email:  jianno@carltonfields.com

David J. Forestner
Florida Bar No. 0371040
David M. Leonard (*admitted pro hac vice*)
Georgia Bar No. 446625
Justan C. Bounds (*admitted pro hac vice*)
Georgia Bar No. 339789
CARLTON FIELDS JORDEN BURT, P.A.
One Atlantic Center
1201 West Peachtree Street, Suite 3000
Atlanta, Georgia  30309
Telephone: (404) 815-3400
Facsimile: (404) 815-3415
Email:  dforestner@carltonfields.com
dleonard@carltonfields.com
jbounds@carltonfields.com

*Attorneys for Defendant Twin City Fire Insurance Company*

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................................................................... i

**TABLE OF AUTHORITIES** ..................................................................................................... ii

**I. INTRODUCTION** ................................................................................................................ 1

**II. RELEVANT BACKGROUND FACTS** ............................................................................ 2

    **A.  The HCC Primary Policy and Twin City Excess Policy** ........................................... 2

        1.  The Definition of Loss ............................................................................................. 2

        2.  The Definition of a Subsidiary ................................................................................ 2

        3.  The Cooperation Clauses ......................................................................................... 3

        4.  Subrogation .............................................................................................................. 3

    **B.  The Underlying Litigation** ............................................................................................ 3

        1.  The Fraudulent Transfer Action .............................................................................. 4

        2.  The Preference Action .............................................................................................. 4

    **C.  Sun's Right to Indemnity from the MDS Entities** ...................................................... 5

    **D.  The Sponsor Groups Negotiate the MDS Entities'** .................................................... 5

**Funding of the Fraudulent Transfer Action** ............................................................................ 5

    **E.  The Fraudulent Transfer Action Settles, and** ............................................................. 7

**Sun Pays No Part of the Settlement Amount.** ............................................................................ 7

        1.  Sun had no legal obligation to pay the Settlement Amount under either the Settlement Agreement or the Sponsor Group Settlement Agreement. ............................................ 7

        2.  Sun Pays No Portion of the Settlement Amount. ...................................................... 8

        3.  Despite paying nothing towards settlement of the Fraudulent Transfer Action, Sun sues Twin City for failure to reimburse those amounts. ............................................ 8

**III. LEGAL ARGUMENT** ...................................................................................................... 9

    **A.  The Settlement Amount is not a covered Loss under the Excess Policy Because** ........ 9

**Sun was Not Legally Obligated to Pay the Settlement Amount and Did Not Pay It** .......... 9

        1.  Sun was not legally obligated to pay the Settlement Amount. ...................................... 9

        2.  Sun Did Not Pay the Settlement Amount .................................................................. 13

    **B.  Sun is Barred from Coverage by Increasing Twin City's Exposure** ........................... 16

        1.  Sun was Entitled to Indemnification by the MDS Entities. ........................................ 16

        2.  Sun's Failure to Comply with a Condition Precedent Bars Coverage. ...................... 18

**IV. CONCLUSION** .................................................................................................................. 19

106268127.1

## <u>TABLE OF AUTHORITIES</u>

**Cases**  **Page(s)**

*Aetna Cas. & Sur. Co. v. Langel*,
 545 So. 2d 466 (Fla. Dist. Ct. App. 1989) ........................................................12, 17

*Aetna Ins. Co. v. Fid. & Cas. Co. of New York*,
 483 F.2d 471 (5th Cir. 1973) ........................................................................17

*Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*,
 335 F.3d 429 (5th Cir. 2003) ........................................................................17

*In re Anson*,
 457 B.R. 130 (Bankr. M.D. Fla. 2011) ..............................................................12

*Bonner v. City of Pritchard, Ala.*,
 661 F.2d 1206 (11th Cir. 1981) ......................................................................17

*E. Baby Stores, Inc. v. Cent. Mut. Ins. Co.*,
 No. 07 CIV. 3890 (LAP), 2008 WL 2276527 (S.D.N.Y. June 2, 2008) ...........................18, 19

*Givans v. Ford Motor Credit Co.*,
 82 So. 3d 864 (Fla. Dist. Ct. App. 2011) ............................................................11

*Kingswharf, Ltd. v. Kranz*,
 545 So. 2d 276 (Fla. Dist. Ct. App. 1989) ...........................................................12

*MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*,
 295 F.R.D. 550 (S.D. Fla. 2013)................................................................9, 10, 11

*Metro. Life Ins. Co. v. McCarson*,
 467 So. 2d 277 (Fla. 1985)........................................................................12, 13

*Nat'l Sur. Corp. v. Charles Carter & Co.*,
 539 F.2d 450 (5th Cir. 1976) ........................................................................12

*Oppenheim v. Reliance Ins.*
 Co., 804 F. Supp. 305, 306-307 (M.D. Fla. 1991) .................................................12

*In re Russo*,
 494 B.R. 562 (Bankr. M.D. Fla. 2013) ..............................................................11

*St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines, Ins. Co.*,
 365 F.3d 263 (4th Cir. 2004) ........................................................................17

*Swaebe v. Fed. Ins. Co.*,
 374 F. App'x 855 (11th Cir. 2010) .................................................................18

106268127.1

*United States v. Olavarrieta,*
    632 F. Supp. 895 (S.D. Fla. 1986) .......................................................................................11

*Unum Life Ins. Co. of Am. v. O'Brien,*
    No. 6:03-CV1433-ORL18DAB, 2004 WL 2283559 (M.D. Fla. Oct. 4, 2004).......................12

*Wal-Mart Stores, Inc. v. RLI Ins. Co.,*
    292 F.3d 583 (8th Cir. 2002) ...............................................................................................17

**Statutes**

De. St. § 17-701 ........................................................................................................................15

De. St. § 18-701 ........................................................................................................................15

Fl. Stat. § 605.0110 ...................................................................................................................15

Fla. Stat. § 620.8203 .................................................................................................................15

N.Y. LLC Law § 601 ................................................................................................................15

N.Y. PTR Law § 121-701 ....................................................................................................15, 16

106268127.1

# I.  INTRODUCTION

Plaintiff Sun Capital Partners, Inc. ("Sun") seeks indemnity under the Universal Excess Policy (the "Excess Policy") issued to it by Defendant Twin City Fire Insurance Company ("Twin City") for sums Sun claimed it paid to settle a 2008 lawsuit (the "Fraudulent Transfer Action"). Sun now admits that it made no such payment, nor did any other insured entity.

Discovery has revealed that Sun seeks insurance coverage for what is, instead, Sun's *investment loss* in MDS Realty Holdings I, LLC and MDS Realty Holdings II, LLC (together with their subsidiaries, the "MDS Entities"), which were the primary defendants in the Fraudulent Transfer Action.  Sun owns minority interests in the MDS Entities.

After the MDS Entities and other defendants settled the Fraudulent Transfer Action, Sun demanded payment from Twin City for its purported share of the settlement, despite having contributed nothing to the settlement. Sun also demanded payment of not only its own attorneys' fees and defense costs, but also a percentage of the attorneys' fees and defense costs incurred by other defendants in the Fraudulent Transfer Action (what Sun inaccurately calls "Team Fees"[1]). These third party payments do not constitute a covered "Loss" under the Excess Policy.

Moreover, even if Sun had paid toward the settlement or the so-called Team Fees, coverage for all of Sun's claimed damages would be barred by failure of a condition precedent. The Primary Policy provides that, as a condition precedent to coverage, the Insured "shall not take any action which in any way increases the Insurer's exposure under the Policy." Here, ongoing discovery has revealed that the MDS Entities were contractually required to settle the Fraudulent Transfer Action for their investors, including Sun. At least two of those entities confirmed this obligation in writing. Nevertheless, Sun rejected that offer of indemnification. In doing so, Sun "increase[d] the Insurer's exposure under the Policy", and breached a condition precedent to coverage. Twin City is, therefore, entitled to summary judgment that Sun's claimed damages are not covered by the Excess Policy.[2]

Finally, Sun again breached the Policies by releasing Twin City's subrogation rights when it gave the MDS Entities and others full releases at the settlement of the underlying litigation. For these reasons, Twin City is entitled to judgment as a matter of law on Sun's claims for "indemnification" of settlement payments.

---

[1] The term "Team Fees" is a misnomer.  There was no agreement for defense costs to be shared among the Sponsor Groups, and Sun never paid any of its co-defendants' defense costs.  However, for the sake of consistency and ease of reference only, Twin City will refer to those fees as Team Fees in this motion.

[2] This motion specifically focuses on two defenses to Sun's claim for indemnity as to the claimed settlement amount.  These defenses can be presented now based on undisputed facts.  A number of additional defenses apply to Sun's claims for coverage for indemnity, for the so-called "Team Fees,", and for Sun's defense costs, including defenses based upon allocation.  Twin City is not waiving any of its defenses to coverage for Sun's alleged indemnity payments, defense costs, or "Team Fees," or any other aspect of Sun's claims.  All defenses as to all claims are reserved.

## II.  RELEVANT BACKGROUND FACTS

**A.      The HCC Primary Policy and Twin City Excess Policy**

Twin City's Excess Policy is a following-form policy in excess of HCC's Primary Policy. (SOF ¶ 4-5.) The Excess Policy includes additional terms, and it is a separate contract with a separate company, and therefore is integrated as a separate contract. It incorporates the majority of the terms of the Primary Policy.  The Excess Policy provides that it is "subject to the same warranties, terms, conditions, definitions, exclusions and endorsements . . . as [were] contained in or as may [have been] added to the Primary Policy." (SOF ¶ 6.) But, "[i]n no event does the policy grant broader coverage than is provided by the most restrictive Primary or Underlying Excess Policy(ies)." *Id.*

**1.       The Definition of Loss**

The Primary Policy's insuring clause provides that:

The **Insurer** shall pay on behalf of the **Insured Organization Loss**, which the **Insured Organization** is legally obligated to pay and which arises from any **Claim** first made against the **Insured Organization** during the **Policy Period** for a **Wrongful Act**.

(SOF ¶ 7.)  The Primary Policy defines Loss, in relevant part, as "damages, settlements and **Costs, Charges and Expenses** incurred by any of the **Insureds** . . . ." (SOF ¶ 11.)[3] Loss, however, does not include: "matters deemed uninsurable under the law pursuant to which this Policy shall be construed" or "any amount allocable to uncovered Loss under this Policy." *Id.*

**2.       Insured Organization**

To come within the coverage of the Policies, the Loss must be incurred by an Insured. The Policies only insure entities, thus an Insured must qualify as an Insured Organization, defined as:

(1)      the entity listed as Item A. of the Declaration of this Policy;

(2)      those entities listed in Endorsement 1 to this Policy;

(3)      any **Subsidiary** thereof; and

(4)      any entity formed by the **Insured** for the sole purpose of performing **Private Equity Acidities** on behalf of any entity listed in sections (1) to (3) of this endorsement.

(5)      in the event of a bankruptcy proceeding instituted by or against the foregoing entities, the resulting debtor in possession (or equivalent status, outside the United States) if any.

provided, however, that the term **Insured Organization** shall not include any **Portfolio Company**.

(SOF ¶¶ 8-9.) The MDS Entities do not meet any of these definitions of Insured Organization.

---

[3] All of the provisions of the Primary Policy and the Twin City Policy are part of the contract between the Sun and Twin City, and many of them are relevant here. By focusing on the defenses in this motion, Twin City is not waiving or otherwise dropping its defenses as to other contract provisions that apply.

2

### 3.    The Definition of a Subsidiary

The relevant definition of Subsidiary includes any organization "which at the inception date of this Policy is named in the **Proposal** [application];" or "which constitutes a **Shell Organization** formed during the **Policy Period**" or "in which more than fifty percent (50%) of the voting stock or other equity interest is owned by any Insured Organization, either directly or through one or more of its Subsidiaries; . . .." (SOF ¶ 12.)

Sun never owned more than 50% of any of the MDS Entities. (SOF ¶ 22.) The MDS Entities, therefore, were not Subsidiaries, nor were they formed solely by a Sun Entity.

### 4.    The Cooperation Clauses

The Primary Policy states that an Insured must comply with the following obligations as a condition precedent to coverage:

> As a condition precedent to coverage, the **Insureds** agree to provide the Insurer with such information, assistance and cooperation as the Insurer or their counsel may reasonably request in connection with the defense, negotiation and settlement of any **Claim**, and the Insureds further agree that they shall not take any action which in any way increases the Insurer's exposure under this Policy.

(SOF ¶ 14.)  The Excess Policy's Cooperation Clause states that Sun "shall do nothing that may prejudice the Underwriters' position or its potential or actual rights of recovery." (SOF ¶ 15.)

### 5.    Subrogation

The Primary Policy also states that in the event that Twin City must make a payment under the Policy, Sun must preserve Twin City's subrogation rights under the Policy:

> In the event of any payments under this Policy, the Insurer shall be subrogated to the **Insureds'** rights of recovery therefore against any person or entity. The **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable the Insurer effectively to bring suit in their name, and shall provide all other assistance and cooperation which the Insurer may reasonably require.

(SOF ¶ 16.)

## B.    <u>The Underlying Litigation</u>

In 2004, Sun, along with affiliates of Cerberus Partners and Klaff/Lubert-Adler (each separately referred to as a "Sponsor Group"), purchased Mervyn's department stores from Target. (SOF ¶ 19.) As part of that transaction, the Sponsor Groups split Mervyn's in two: retail operations were retained by Mervyn's, and all real estate assets were transferred to bankruptcy-remote special purpose entities under the umbrella of MDS Realty Holdings I, LLC and MDS Realty Holdings II, LLC (together with their subsidiaries, the "MDS Entities"). (SOF ¶¶ 20-21.)

In 2008, Mervyn's filed for bankruptcy protection in the United States District Court in Delaware. (SOF ¶ 25.) That same year, a committee of unsecured creditors (the "Committee")

<div align="center">3</div>

brought an adversary proceeding (the "Fraudulent Transfer Action") against multiple defendants, including several Sun entities, the MDS Entities, the other Sponsor Groups, Target, and the lenders that financed and refinanced the sale of Mervyn's (the "Lenders"). (SOF ¶¶ 1, 26.) The Committee alleged that the Mervyn's split constituted a series of fraudulent transfers by all participants, including the MDS Entities. (SOF ¶¶ 26, 28.) The Committee also alleged, in one of the thirty-two counts of its Amended Complaint, that certain transfers were a breach of the purchasers' fiduciary duties. (SOF ¶ 28.)

The Committee later brought a separate adversary proceeding solely against two Sun entities alleging that a secured loan they made to Mervyn's should be re-characterized as a capital contribution and thus an asset available to the unsecured creditors (the "Preference Action"). (SOF ¶¶ 39-40.)

### 1.     The Fraudulent Transfer Action

The Fraudulent Transfer Action sought the avoidance of over $1 billion in real estate and other transfers from Mervyn's to the MDS Entities and the Sponsor Groups. (SOF ¶¶ 1, 26, 28-30.) The crux of the Fraudulent Transfer Action was the Committee's allegation that the Sponsor Groups' transfer of all of Mervyn's real estate assets to the MDS Entities rendered Mervyn's insolvent and was implemented in an effort to hinder and delay collection by unsecured creditors. *See id.*

Sun reported the Fraudulent Transfer Action to its insurers in late 2008, and the primary carrier, Houston Casualty Company ("HCC"), reserved its rights under its Private Equity Professional Insurance Policy (the "Primary Policy"). (SOF ¶¶ 31, 34.) Twin City also reserved its rights under the Excess Policy and incorporated HCC's coverage positions. (SOF ¶¶ 32-33, 35.) Sun retained the law firm Kirkland & Ellis to defend it in the Fraudulent Transfer Action. (SOF ¶ 36.)

### 2.     The Preference Action

Several months after the filing of the Fraudulent Transfer Action, the Committee filed a separate adversary proceeding against two Sun entities seeking to re-characterize a $30 million secured loan they made to Mervyn's as a capital contribution, and to void the security interest as a preferential transfer. (SOF ¶¶ 39-40.) During the pendency of that litigation, the $30 million was held in an escrow account that ultimately accumulated more than $3 million in interest (the "Sun Escrow"). (SOF ¶¶ 41-42.) Sun ultimately released the Sun Escrow to the Committee as part of the overall $166 million settlement. (SOF ¶¶ 64-65.) Both HCC and Twin City denied coverage for the Preference Action, which included Sun's release of the Sun Escrow. (SOF ¶¶ 32-33, 43-44, 64-65.) Sun has not claimed the Sun Escrow as damages, and Twin City's denial of coverage for the Preference Action is not at issue in this action. (SOF ¶ 45.)

4

C.    **Sun's Right to Indemnity from the MDS Entities**

As a result of the Sponsor Groups' decision to split Mervyn's in two, MDS Realty Holdings I, LLC ("MDS I") and MDS Realty Holdings II, LLC ("MDS II"), through their subsidiaries and affiliates, held all of the real estate once belonging to Mervyn's. (SOF ¶ 21.) Two Sun entities that were defendants in the Fraudulent Transfer Action were minority members of both MDS I and MDS II. (SOF ¶ 22.)  Because Sun was only a minority owner, the MDS Entities did not qualify as a "Subsidiary"[4] under the Policies. (SOF ¶¶ 12, 22.) The other Sponsor Groups held the remaining interests in MDS I and MDS II. (SOF ¶ 23.)

The MDS I and MDS II Operating Agreements contain indemnification provisions whereby the MDS Entities were obligated to indemnify any of their members for any action related to the transfer or purchase of Mervyn's property. (SOF ¶ 46.) Because Sun was a member of both MDS I and MDS II, the MDS Entities were obligated to indemnify Sun for any settlement or defense expenses related to the Fraudulent Transfer Action. (SOF ¶¶ 22, 26, 46.)

The MDS Entities, through their managing member, confirmed that obligation on October 12, 2010, when they sent a Joint Notice of the Management Boards of MDS Realty Holdings I, LLC and MDS Realty Holdings II, LLC to their members. (SOF ¶¶ 47-51.) The Notice attached a proposed Resolution acknowledging the duty to indemnify Sun and other co-defendants in the Fraudulent Transfer Action:

> WHEREAS, pursuant to Section 11.1 of the Company's Second Amended and Restated Limited Liability Company Agreement (the "Agreement"), the Company is obligated to indemnify, among others, its members, managers, directors, controlling persons, agents and affiliates or designees thereof from and against any and all claims, actions, suits, proceedings, liabilities, obligations, losses, damages, judgments, fines, penalties, amounts paid as settlement, interest, costs and expenses incurred by such persons arising from or a consequence of the Adversary Proceeding [the Fraudulent Transfer Action];

(SOF ¶ 48.) The Resolution also resolved that the MDS Entities would seek a settlement on behalf of all of the defendants except Target in the Fraudulent Transfer Action, which it referred to as the "Adversary Proceeding." (SOF ¶ 49.) The Resolution further stated that it would set up a contingency fund to pay "claims for indemnification which the Board is legally obligated to honor." (SOF ¶ 50.) Sun strenuously objected to this indemnification. (SOF ¶¶ 51, 52.)

D.    **The Sponsor Groups Negotiate the MDS Entities'**
**Funding of the Fraudulent Transfer Action**

In late 2010, after Sun scuttled indemnification, Cerberus notified Sun that it and the other Sponsor Groups still "want to use the MDS proceeds to the extent available" and "want to use MDS to pay the legal and other fees of the litigation." (SOF ¶ 54.) The Sponsor Groups,

---

[4] In fact, the MDS Entities did not meet any of the definitions of a "Subsidiary" under the Policies. *See* Section II(A)(3) above.

5

including Sun, continued negotiating how best to orchestrate those payments. (SOF ¶¶ 55-58.)

By early 2011, an agreement in principle was reached to have the MDS Entities pay any settlement amounts and/or legal fees in the Fraudulent Transfer Action. (SOF ¶ 55.) The Sponsor Groups also contemplated that the MDS Entities would pay litigation expenses. *Id.* Nevertheless, Sun's counsel notified its insurers that the Sponsor Groups would share some defense costs, although there remained "many significant issues that ha[d] yet to be discussed or resolved" and "the mechanics [were] still in flux." *Id.*

In July of 2011, Sun's general counsel noted that "the sponsors previously agreed in principle to use MDS assets to pay legal expenses and fund any settlement or judgment in the fraudulent conveyance case." (SOF ¶ 56.) By December of 2011, Sun's defense counsel reported to Sun that the agreement-in-principle was intended to "[m]aximize the use of the jointly owned MDS and MPC assets so that *(to the greatest extent possible) nobody would have to write a check for a settlement / verdict in the range of expected outcomes."* (SOF ¶ 57.) (emphasis added.) And, as Sun's defense counsel noted, under that agreement, "Sun would not need to come out of pocket unless the verdict [or settlement] in the fraudulent conveyance action exceed[ed] approximately $400M." *Id.* Neither Sun nor its counsel informed Twin City of these agreements.

In June of 2012, Sun's defense counsel explained that, under their agreement, "Cerberus [was] going to have to come out of pocket (beyond MDS / MPC cash) while Sun and KLA would not." (SOF ¶ 58.) That agreement was eventually memorialized in the Sponsor Group Settlement Agreement—a side-agreement between the Sponsor Groups and the MDS Entities that established the sources and mechanisms for paying any settlement expenses and defense fees related to the Fraudulent Transfer Action. (SOF ¶¶ 65-73.) The Sponsor Group Settlement Agreement required no payment from Sun for settling the Fraudulent Transfer Action. *Id.*

On September 25, 2012, the same day that Sun demanded millions in "indemnity" payments from Twin City, Sun's general counsel marked up a draft of the Sponsor Group Settlement Agreement, seeking assurance from its defense counsel that Sun would make no payment:

the Paying Agent Account shall be made unless there shall be a simultaneous release from escrow of each of the releases by the Debtors and the Committee to the defendants to the Litigation; provided that with the approval of each of the Sponsor Groups funds may be released from the Paying Agent Account in advance of the Closing Date solely for the purpose of securing the Defendants' Administrative Discount Credit under the terms of the ~~Settlement Agreement~~. In the event that any of the MDS Entities, the MPC Entities, the Sun Entities, the Lubert Adler Entities or the Cerberus Entities fails to make (or cause to be made) any payment required to be made by it hereunder, then no funds in the Paying Agent Account shall be applied to the Total

6

(SOF ¶¶ 74, 97-104.) (handwritten comments added by Deryl Couch, General Counsel of Sun Capital, stating "*no payment by Sun, correct?  Need to so specify*") (emphasis added).

**E.    The Fraudulent Transfer Action Settles, and
       Sun Pays No Part of the Settlement Amount.**

The Sponsor Groups—on behalf of all defendants including the MDS Entities, Target and the Lenders—settled both the Fraudulent Transfer Action and Preference Action on September 10, 2012, for an aggregate amount of $166 million. (SOF ¶¶ 59, 64.) The terms of the Settlement Agreement governed payment of the $166 million by the Sponsor Groups and Target to the Committee. Payments were from three sources; transfer of the contents of two escrow funds— one $33 million escrow from the Preference Action ("Sun Escrow") and the other escrow from the sale of MDS's real property ("MDS Escrow")—and a payment of approximately $80 million via a payment agent, JDA Agent, LLC ("JDA Agent"). (SOF ¶¶ 64-65.)

The terms of the Sponsor Group Settlement Agreement apportioned $132 million of the $166 million to settlement of the Fraudulent Transfer Action by the Sponsor Groups. (SOF ¶¶ 61-72.) The Sponsor Group Settlement Agreement also set forth the funding of the JDA Agent payment as well as the payment of the Sponsor Groups' defense expenses. *Id.*

**1.    Sun Had No Legal Obligation to Pay the Settlement Amount Under Either
        the Settlement Agreement or the Sponsor Group Settlement Agreement.**

Sun now seeks $21,461,173.15 (the claimed "Settlement Amount") from Twin City that it asserts is its "allocated" portion of the $132 million settlement of the Fraudulent Transfer Action.[5] (SOF ¶ 106.) However, pursuant to the Settlement Agreement, the $166 million global settlement was paid from three sources, none of which qualified as covered "Loss" incurred by Sun: (i) escrowed funds from the Preference Action not at issue here[6]; (ii) escrowed funds from MDS sales of real property; and (iii) a cash payment from JDA Agent. (SOF ¶¶ 64-65.) The

---

[5] There are two different allocations related to this claim. First, the $132 million settlement, (again, the "Settlement Amount") must be allocated between Sun and the other Sponsor Groups.  Sun agreed with its co-defendants' that Sun's allocation would be 15.94% or $21,461,173.15.  Second, any "Loss" incurred by Sun would have to be further allocated between covered amounts and non-covered amounts pursuant to the allocation clause the Primary Policy.  Sun's initial claim to HCC and Twin City allocated 25% of Sun's portion of the Settlement Amount to covered claims; in other words, Sun reduced the $21.46 million figure to $5,365,223.28, and claimed only that reduced amount from its insurers.  Sun has since changed its position and in supplemental discovery response now claim the entire $21.46 million is covered. (SOF ¶ 106.)  (Twin City reserves its defenses showing that the allocation should be much lower.)  However, Twin City shows in this motion that Sun never incurred any Loss from the Settlement Amount, and thus is not entitled to indemnification in any amount. A finding that sustains Twin City's position in this motion would render the insurance allocation issue moot, as to the Settlement Amount.

[6] The Sponsor Group Settlement Agreement allocated only $23 million of the $33,030,864.44 in the Sun Escrow Account to the settlement of the Preference Action, for which Sun does not contest a lack of coverage. Of the remaining amount in the Sun Escrow Account, the Sponsor Groups allocated $5 million to pay a portion of the fees of the Lenders' attorneys (Kaye Scholer LLP) pursuant to indemnification obligations in the original 2004 purchase documents, and the balance was returned to Sun. (SOF ¶¶ 92-93.)

7

funding for the remaining balance due (from the payment agent) was governed by the Sponsor Group Settlement Agreement.[7] (SOF ¶¶ 65-73.) Like the Settlement Agreement, the Sponsor Group Settlement Agreement does not require any payment by Sun to settle the Fraudulent Transfer Action. *See id.*

The Sponsor Group Settlement Agreement requires payment to JDA Agent from three sources: (i) MDS cash-on-hand (supplemented by a loan from Sponsor Group-controlled MPC Realty Holdings, LLC); (ii) an MDS capital call that expressly excludes Sun; and (iii) a one-time Cerberus payment of $29,520,000. (SOF ¶ 68.) No payment by Sun was ever contemplated.

**2.      Sun Pays No Portion of the Settlement Amount.**

Consistent with the Sponsor Groups' stated intent and the language of both the Settlement Agreement and Sponsor Group Settlement Agreement, Sun paid nothing towards the Settlement Amount. (SOF ¶¶ 74-94.) The records of JDA Agent show eleven separate deposits totaling over $106 million, none of which came from Sun or a subsidiary of Sun. (SOF ¶¶ 75-76.) Instead, payments were made by other Sponsor Groups or MDS Entities, including a direct payment made by MPC Realty Holdings, LLC on behalf of the MDS Entities. (SOF ¶ 83.)

After seeking payment from Twin City for a claim it never intended to pay, on December 3, 2012, ***Sun was paid*** $10,575,982.42 from JDA Agent. (*Id.*; SOF ¶ 77.)

**3.      Despite Paying Nothing Towards Settlement of the Fraudulent Transfer Action, Sun Sues Twin City for Failure to Reimburse Those Amounts.**

Sun first informed Twin City of the settlement of the Fraudulent Transfer Action in a September 25, 2012 telephone conference with its broker and insurers. (SOF ¶ 97.) Sun claimed it was responsible for $7,607,483.68 of its own defense fees, plus its purported 15.94% share of the $132 million settlement of the Fraudulent Transfer Action totaling $21,461,173.15, and a 15.94% "allocated" portion of defense fees incurred by counsel for Sun's co-defendants totaling $6,439,441.20 (the so-called "Team Fees"). (SOF ¶¶ 99-107.) Sun itself allocated 25% of the Settlement Amount to covered claims, or $5,365,293.28, thereby acknowledging that at least 75% of its purported $21 million+ share of the Settlement Amount represented disgorgement and was not covered. *See id.* During the call, Sun demanded indemnification from HCC and Twin City in the total amount of $15,961,494.35. (SOF ¶ 104.) Sun did not inform Twin City of Sun's right to indemnification from the MDS Entities.

Twin City denied coverage for Sun's alleged portion of the Settlement Amount and the so-called Team Fees on November 2, 2012. (SOF ¶ 105.) Twin City did not deny coverage for Sun's own defense costs (Twin City did not yet know about the MDS Entities' indemnification

---

[7] By not raising them in this Motion, Twin City is not waiving any defenses relating to the Sponsor Group Settlement Agreement including, but not limited to: that it was entered into without consent by Twin City; that it understates the payment amount for the Preference Action; and, that it understates the amount contributed by Target.

obligations), however, it requested discussions about a proper allocation of defense costs between covered and uncovered claims. *Id.*

Sun brought this action on December 20, 2012, alleging "the failure of Twin City to comply with its defense and indemnity obligations under the [Excess] Policy" for failing to reimburse Sun for payments.  But these were payments that Sun did not make and that—as Twin City would only learn later in discovery—Sun never owed. (*See* SOF ¶¶ 2, 3, 46.)

### III.  LEGAL ARGUMENT

"Florida law requires that the insured bear the burden of proving that a claim against it is covered by the policy." *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 616 (S.D. Fla. 2013) (citing *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511 (11th Cir. 1997). Sun cannot do so.

First, Sun is not entitled to coverage for the $21,461,173.15 Settlement Amount that it did not incur, did not pay, and did not have to pay.  Because the undisputed evidence shows that Sun was not "Legally Obligated to Pay" the Settlement Amount and suffered no "Loss" as a result, coverage does not exist for the Settlement Amount as a matter of law.

Second, even if the Settlement Amount otherwise qualified for coverage, coverage would be barred because Sun breached the insurance contract by refusing to accept an offer of complete indemnity from MDS.

**A.    The Settlement Amount is not a covered Loss under the Excess Policy Because Sun was Not Legally Obligated to Pay the Settlement Amount and Did Not Pay It**

There is no genuine dispute that Sun had no obligation to pay the Settlement Amount and that third parties, not Sun, made those payments.  With no obligation to pay and no payment, Sun cannot establish coverage under the Policy for the Settlement Amount.

**1.    Sun Was Not Legally Obligated to Pay the Settlement Amount.**

Subject to all other terms and conditions, the Policy provides that:

> The **Insurer** shall pay on behalf of the **Insured Organization Loss**, which the **Insured Organization** is legally obligated to pay and which arises from any **Claim** first made against the **Insured Organization** during the **Policy Period** for a **Wrongful Act**.

(SOF ¶  7.) Thus, to trigger the Insuring Clause, Sun must have been legally obligated to pay a third party before Twin City could pay that third party "on behalf of" Sun.  The undisputed evidence establishes that Sun had no such obligation.

9

### a. Neither settlement agreement legally obligated Sun to pay the Settlement Amount.

The Settlement Agreement and the Sponsor Group Settlement Agreement created the only payment obligations related to the settlement. Neither created a legal obligation for Sun to pay the Settlement Amount.

#### i. *The Settlement Agreement*

The Settlement Agreement provides that the Settlement Amount was to be paid from three sources, as follows:

> 1.      <u>Settlement Payment</u>.  On the Closing Date (as defined in paragraph 14 below), on behalf of the Defendants, JDA Agent, LLC (the "<u>Defendant Payment Agent</u>"), shall pay, or direct the payment of, the aggregate sum of $166,000,000 (One Hundred Sixty-Six Million) to the Debtors' estates payable as follows:  (a) the release of Sun Escrowed Funds to the Debtors' estates; (b) the release of the MDS Escrowed Funds to the Debtors' estates; and (c) cash from the Defendant Payment Agent to the Debtors' estates in an amount to be determined two Business Days prior to the Closing Date (defined below) based upon the amount of the Sun Escrowed Funds, MDS Escrowed Funds, and the amount of the "Administrative Discount"

(SOF ¶ 65.)  None of these payments were to be made by Sun.  The release of "Sun Escrowed Funds" related to monies paid in settlement of the Preference Action, and other sums for which Sun has not sought coverage here.[8]  The MDS Escrowed Funds were paid from the MDS Entities' escrow account.  And, the amounts to be paid by the payment agent, JDA Agent, were funded by defendants other than Sun, as established by the Sponsor Group Settlement Agreement discussed below.

#### ii. *The Sponsor Group Settlement Agreement*

The payments to be made by JDA Agent under the Settlement Agreement were governed by the Sponsor Group Settlement Agreement, which also required no payment from Sun. (SOF ¶¶ 66, 68, 71-73.)

Instead, the Sponsor Group Settlement Agreement mandates that "[e]ach Sponsor Group shall be responsible for funding (to the extent provided in this <u>Section 5(c)</u>, and subject to adjustment as otherwise provided in this Agreement) its respective share of the Net Total Settlement Amount." (SOF ¶¶ 66, 68.) Section 5(c), in turn, identifies three sources of funds from the Sponsor Groups, none of which contemplate payment from Sun. *Id.*

Section 5(c) requires that the remaining payment obligations "shall be funded from the following amounts:"

> (i)      from payment of the remaining MDS/MPC Cash . . .;

---

[8] The Sponsor Group Settlement Agreement allocates the $33,030,864.44 in the Sun Escrow Account as follows:  (i) $23 million to pay for settlement of the Preference Action; (ii) $5 million to pay a portion of the Lenders' attorneys, for which Sun does not here seek coverage; and (iii) return of the balance to Sun. (SOF ¶ 69.)

(ii)     $31,500,000 . . . in the aggregate in response to a capital call by KLA/Mervyn's as managing member of the MDS Entities . . . [though] *the Sun Entities shall not be required to fund out-of-pocket any amount* in response to such capital call . . .; and

(iii)    by the Cerberus Entities' payment of $29,520,000.

(SOF ¶ 68 (emphasis added).) Simply put, neither the Settlement Agreement nor the Sponsor Group Settlement Agreement required any payment of the Settlement Amount from Sun.

### b.    At most, Sun had a contingent obligation to pay, and that contingency never occurred.

The only portion of either settlement agreement that contemplates any potential payment from Sun is the a sentence that follows the Settlement Agreement's specification as to the source of the settlement funds:

> [t]he Sponsor Defendants shall be jointly and severally liable for the Settlement Payment and the Estate Parties shall have no recourse or claim against any individual Defendant other than the Sponsor Defendants for any portion of the Settlement Payment.

(SOF ¶ 65.)   Coming after the Settlement Agreement's provision for payment from other sources, this reference to joint and several liability—but not payment—can only operate as a guarantee.   The term "Settlement Payment" is defined as "(a) the release of Sun Escrowed Funds to the Debtors' estates [i.e., the Preference Action settlement not at issue here]; (b) the release of the MDS Escrowed Funds to the Debtors' estates; and (c) cash from the Defendant Payment Agent to the Debtors' estates . . .." *Id.* Because the Settlement Agreement was to be paid from other sources, the Sponsor Groups, including Sun, could only be called upon for payment in the event that those other sources failed to make the agreed upon payments. *Id.* Accordingly, Sun's limited obligation was contingent on the Settlement Payment, or some part thereof, not being paid. That contingency never occurred—it is undisputed that the Settlement Payment has been paid in full.  (SOF ¶ 94.)

Because Sun's obligation was merely contingent upon nonpayment by the other sources, Sun's obligation fits "squarely within hornbook definitions of a guarantor." *United States v. Olavarrieta*, 632 F. Supp. 895, 899 (S.D. Fla. 1986). A guarantor's "obligation arise[s] only upon the principal's failure to perform."  *Givans v. Ford Motor Credit Co.*, 82 So. 3d 864, 865 (Fla. Dist. Ct. App. 2011) (emphasis added); *see also In re Russo*, 494 B.R. 562, 566 (Bankr. M.D. Fla. 2013) ("Courts have recognized that a personal guaranty is the classic example of a contingent liability because the guarantor's liability is triggered only if the principal obligor has failed to satisfy the debt.").

Here, it is undisputed that "[t]he settlement was paid." (SOF ¶ 94; *see also* SOF ¶ 88 ("we closed the Mervyn's Settlement Agreement today"). Accordingly, Sun never had any obligation to make a payment itself, and in fact none of that payment came from Sun or any of its

106268127.1

Subsidiaries. (SOF ¶¶ 75-77.)  Instead, on December 3, 2012, Sun *received* $10,575,982.42 from JDA. (SOF ¶ 77.)

      **c.**      **There is no one for Twin City to pay.**

A policy with a pay-on-behalf-of insurance clause "does not provide for payment to the insured, but payment on behalf of the insured." *Nat'l Sur. Corp. v. Charles Carter & Co.*, 539 F.2d 450, 458 (5th Cir. 1976). Thus, if there were coverage (and there are numerous other reasons why there is not), Twin City would be required to pay the entity to which Sun is liable. But here, no such entity or person exists. The plaintiffs in the Fraudulent Transfer Action have been satisfied and have released Sun and its co-defendants from any further obligation. (SOF ¶¶ 94-95.)  Moreover, Sun and its co-defendants released each other from any liability. (SOF ¶ 96.) As such, there is no one that Twin City could pay "on behalf of" Sun.

      **d.**      **Sun is seeking an impermissible double recovery.**

Sun is not seeking coverage for a claim that ***should have been paid*** by others, it is seeking payment for a claim that ***was paid*** by others.  As such, the recovery Sun seeks would be an impermissible double recovery under Florida law. *See Kingswharf, Ltd. v. Kranz*, 545 So.2d 276, 278 (Fla. Dist. Ct. App. 1989) ("Double recovery of the same element of damages is prohibited."); *Aetna Cas. & Sur. Co. v. Langel*, 545 So.2d 466, 466 (Fla. Dist. Ct. App. 1989) ("Regardless of the available insurance coverage, an accident victim is not entitled to be compensated twice for his damage award."); *In re Anson*, 457 B.R. 130, 136-137 (Bankr. M.D. Fla. 2011) (ruling in response to the possibility of "sanctioning a windfall or double recovery" that "[o]f course, Florida law prohibits such conduct, and the Court will not countenance Liberty's attempt to obtain that result here"); *Unum Life Ins. Co. of Am.  v. O'Brien*, No. 6:03-CV1433-ORL18DAB, 2004 WL 2283559, at *5 (M.D. Fla. Oct. 4, 2004) (stating that a "double recovery" is "clearly inequitable"); *Oppenheim v. Reliance Ins.* Co., 804 F. Supp. 305, 306-307 (M.D. Fla. 1991) (noting that double recovery raises "certain fundamental questions of public policy").

Sun has argued that, because it purchased a liability policy, as opposed to an indemnity policy, it does not have to show that it paid a claim, only that it incurred a liability. This argument leads to the illogical result that each entity defendant could separately make a claim for $166 million dollars against each of their respective insurers, totaling over $7 billion in insurance proceeds. It is also based on a fundamental misunderstanding of liability insurance.

In Florida, under an indemnity policy, the insurer can demand proof of payment to the claimant as a condition precedent to its obligation to reimburse the insured. *See*, *e.g.*, *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985).  In contrast, a "liability" policy requires the insurer to pay the loss directly to the claimant:

> In the usual liability policy, the insurer is bound to pay damages for bodily injury
> or property damage for which any covered person becomes legally liable, up to
> the applicable policy limits, because of an accident and such damages are directly
> payable to the injured party.

*Id.*  This aspect of a liability policy merely removes one barrier for an insured that does not have adequate funds on hand to pay for a settlement or judgment. A liability type policy does not, however, ignore the specific requirements of the policy wording, nor does it allow an insured a windfall for a loss that does not exist, or to seek a double recovery on a joint liability that a co-defendant has already paid.

### 2.        Sun Did Not Pay the Settlement Amount.

In relevant part, the Policy states that "**Loss** means "damages, settlements and **Costs, Charges and Expenses** incurred by any of the **Insureds** . . ."" (SOF ¶ 11.) Sun neither paid nor incurred any sums towards the Settlement Amount, and thus Sun cannot establish a **Loss** under the Policy.[9]

### a.        A Third Party's Payment of the Settlement Amount Does not Constitute Loss

It is undisputed that Sun paid nothing towards the Settlement Amount. (SOF ¶¶ 65-66, 68, 71-73, 76.) Sun admits that "the MDS assets were used to fund the settlement." (SOF ¶ 78.) This lack of payment is confirmed by the records of JDA Agent, which show payments from Sun's co-defendants MDS, Klaff/Lubert-Adler and Cerberus, among others, but no payments from Sun. (SOF ¶ 76.)

Instead, as contemplated by the Settlement Agreement and the Sponsor Group Settlement Agreement, Sun *received* $10,575,982.42 at closing. (SOF ¶ 77.)

### b.        The Third Parties that paid the Settlement Amount are not insured under the Policy.

It is similarly undisputed that none of the parties who paid the Settlement Amount are insured under the Policy. The HCC Policy defines "**Insureds**" as either "**Insured Organizations**" and/or "**Insured Persons**." (SOF ¶ 8.) Because there were no individual defendants in the Underlying Litigation, the definition of **Insured Organizations** determines whether any of the companies that paid the settlement funds are insured under the Policy in this case. Under the Primary Policy:

**Insured Organization** means:

(1)        the entity listed in Item A. of the Declarations of this Policy;

(2)        those entities listed in Endorsement 1 to this Policy;

(3)        any **Subsidiary** thereof; and

---

[9] Twin City reserves the right to address other bases and damages on which Sun's claim of a **Loss** fails in subsequent motions for summary judgment or at trial.

(4)     any entity formed by the **Insured** for the sole purpose of performing **Private Equity Activities** on behalf of any entity listed in sections (1) to (3) of this endorsement.

(5)     in the event of a bankruptcy proceeding instituted by or against the foregoing entities, the resulting debtor in possession (or equivalent status, outside the United States) if any.

provided, however, that the term **Insured Organization** shall not include any **Portfolio Company**.

(SOF ¶ 8.)  There is no competent evidence to support that either of the two entities who paid the Settlement Amount—MDS Realty Holdings I, LLC ("MDS I") and MPC Realty Holdings, LLC ("MPC")—fall within this definition of **Insured Organization**.[10]

First, the MDS Entities are not listed in Item A. of the Declarations of the Primary Policy. Second, the MDS Entities are not listed in Endorsement 1 of the Primary Policy. Third, the MDS Entities were not formed for the sole purpose of performing Private Equity Activities for Sun; Sun was a minority owner and these companies had the purpose of holding real estate for many Sponsor Groups. Fourth, as the MDS I and MDS II operating agreements make clear, they were not formed for the sole purpose of performing activities on Sun's behalf. (SOF ¶¶ 81-82.) Finally, because two Sun subsidiaries owned minority equity investments in MDS I, MDS II and MPC, those three entities are **Portfolio Companies** and, therefore, are not **Insured Organizations** under the HCC Policy.

Instead, MDS I and MPC are **Portfolio Companies,** as defined by the Primary Policy, and, therefore, are specifically defined as outside the definition of an **Insured Organization**.

The Primary Policy defines a **Portfolio Company** as:

**. . .** any organization, partnership, limited liability company or other type of organization or any direct or indirect subsidiary or affiliate of any of the foregoing (other than an **Insured Organization**) in which one or more **Insured Organization(s)** in the past, present or future maintains or had previously maintained or proposes to maintain an equity or debt or convertible security investment and/or board representation or officer, managing member, trustee, regent, governor, member of the board of managers, member of a management board, member of a supervisory board, board advisor or board observer status, but solely in connection with **Private Equity Activities** by the **Insured Organization.**

(SOF ¶ 13.)

Sun alleges that two of its entities, SCSF Mervyn's (Offshore), Inc. and SCSF Mervyn's (US), LLC, are insureds under the Policy. Both are minority members of MDS I, MDS II and MPC. (SOF ¶¶ 22, 84, 86.) As such, the two entities that did pay the Settlement Amount, MDS I and MPC, are expressly outside the coverage of the Policy.

---

[10] Significantly, the MDS Entities have never sought coverage as Insureds under the Sun Policies, and they are not parties to this coverage action.

### c.   Payment by MDS I and MPC is not payment by Sun.

Sun argues that its minority interest in the MDS Entities and MPC entitles it to recover the sums those entities paid, claiming that it "did pay by virtue of having its ownership percentage in the MDS entities." (SOF ¶ 79.)  There is no legal basis for this position.

The MDS Entities were co-defendants in the underlying litigation, and both the MDS Entities and MPC are independent limited liability companies and limited partnerships. (*See* SOF ¶ 24.)  It is black-letter law that neither a member of a limited liability company nor a partner of a limited partnership has an interest in the assets of that LLC or limited partnership. *See* De. St. § 18-701 ("A limited liability company interest is personal property. A member has no interest in specific limited liability company property."); De. St. § 17-701 ("A partnership interest is personal property. A partner has no interest in specific limited partnership property."); Fl. St. § 605.0110 ("A member of a limited liability company has no interest in any specific limited liability company property."); Fl. St. § 620.8203 (Property acquired by a partnership is property of the partnership and not of the partners individually."); N.Y. LLC Law § 601 ("A membership interest in the limited liability company is personal property. A member has no interest in specific property of the limited liability company."); N.Y. PTR Law § 121-701 ("An interest in a limited partnership is personal property and a partner has no specific interest in partnership property.").

That black-letter law is similarly memorialized in the operating agreements of MDS I and MDS II (the parents of the remaining MDS Entities). (SOF ¶ 82.) Section 2.1(c) of those operating agreements dictates that "Title to Assets, whether real, personal or mixed, tangible or intangible, shall be deemed to be owned by the Company, and no Member, individually or collectively, shall have any ownership interest in such Assets or any portion thereof." *Id.*

Nor can Sun claim that the MDS payments were made on Sun's behalf. As Special Purpose Entities, MDS I and MDS II were prohibited from co-mingling their funds with their members or making payments to their members, including Sun. (SOF ¶ 81.) MDS I and MDS II had to "conduct [their] business in [their] own name and strictly comply with all organizational formalities to maintain [their] separate existence." *Id.* Thus, they could "not hold out [their] credit or assets as being available to satisfy the obligations of others," nor could they "pledge [their] assets for the benefit of any other Person." *Id.*  MDS I and MDS II could not "guarantee any obligation of any Person," nor could they "incur, create or assume any indebtedness." *Id.* MDS I and MDS II were plainly prohibited from making payments on Sun's behalf as Sun claims.

In sum, the MDS Entities were only authorized to make payments on their own behalf, whether as direct defendants in the Underlying Litigation or as an indemnitors under the terms of their Operating Agreements.[11]

**B.**      **Sun is Barred from Coverage by Increasing Twin City's Exposure**

The Primary Policy provides that "as a condition precedent to coverage, … the **Insureds** [] agree that they shall not take any action which in any way increases the **Insurer's** exposure under this policy." SOF ¶ 14.)[12] Sun's refusal of the full indemnity due it for the Fraudulent Transfer Action did just that. This refusal operates as a complete bar to coverage under the Policy, were any to otherwise exist, for any and all damages Sun claims from the Fraudulent Transfer Action.

**1.**      **Sun was Entitled to Indemnification by the MDS Entities.**

Sun had a contractual right to indemnity from the MDS Entities and MPC.  This right arose from the Operating Agreements of certain MDS Entities and MPC, which provided indemnity for:

> . . . any and all claims, actions, suits, proceedings, liabilities, obligations, losses, damages, judgments, fines, penalties, amounts paid in settlement, interest, costs and expenses (including reasonable attorney's and accountant's fees, court costs and other out-of-pocket expenses actually and reasonably incurred in investigating, preparing or defending the foregoing) . . . that otherwise in any way relate to or arise out of any action or inaction by such Indemnified Person.

(SOF ¶ 46.)  The Indemnified Persons under these Operating Agreements included:

> . . . any Person who was or is a party . . . by reason of the fact that such Person is or was a Member, Officer, Manager, director, controlling person, employee, legal representative or agent of the Company.

*Id.*  As members of both the MDS Entities and MPC and as co-defendants in the Fraudulent Transfer Action, the Sun entities were entitled to indemnity for the Fraudulent Transfer Action under the MDS and MPC Operating Agreements.  (SOF ¶¶ 22, 46.)

---

[11] Sun has often raised the inapt concept of the collateral source rule to argue that the MDS Entities' payment of the Settlement Amount does not prevent Sun from making a claim for monies never paid or owed by Sun. Like many of its arguments, Sun merely puts an extra step in the chain that leads to the eventual failure of its claims. First, the payment by the MDS Entities is not a collateral source. The MDS Entities were defendants in the lawsuit, and the primary defendants holding the alleged fraudulent transfers. Further, the MDS Entities operated under agreements that barred any payment of any obligation on any member's behalf, including Sun. Thus the MDS Entities' payment of the settlement was a direct obligation arising out of the Settlement Agreement and Sponsor Group Settlement Agreement, nothing more. Second, the payment by the MDS Entities is not collateral to the issues before the Court in this action. Third, Twin City was entitled to subrogation against the MDS Entities for any payment made by Twin City. Because Sun released all subrogation rights, it cannot claim payments on its behalf.

[12] In turn, the Policy provides that it subject to the same "terms" as the Primary Policy and, further, that "[i]n no event shall th[e Excess Policy] grant broader coverage than is provided by the most restrictive Primary or Underlying Excess Policy(ies)." (SOF ¶ 6.)

Accordingly, on October 12, 2010, MDS sent a Joint Notice of the Management Boards of MDS I & II to their members to vote on proposed resolutions, including a resolution acknowledging the duty to indemnify Sun and others in the Fraudulent Transfer Action:

> WHEREAS, pursuant to Section 11.1 of the Company's Second Amended and Restated Limited Liability Company Agreement (the "Agreement"), the Company is obligated to indemnify, among others, its members, managers, directors, controlling persons, agents and affiliates or designees thereof from and against any and all claims, actions, suits, proceedings, liabilities, obligations, losses, damages, judgments, fines, penalties, amounts paid as settlement, interest, costs and expenses incurred by such persons arising from or a consequence of the Adversary Proceeding [the Fraudulent Transfer Action] …

(SOF ¶ 48.)

Where, as here, an insured has both a third party contractual right to indemnity and the potential for insurance coverage, the insured must look first to its third party contractual rights. *See Aetna Ins. Co. v. Fid. & Cas. Co. of New York*, 483 F.2d 471, 473 (5th Cir. 1973) (granting summary judgment to insurer where judgment against insured was covered by third party contract of indemnity)[13] *see also Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583, 588 (8th Cir. 2002) (noting that there are "many cases ruling that indemnity agreements determine the allocation of liability in an insurance dispute"); *Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335 F.3d 429, 435-441 (5th Cir. 2003) (collecting and citing cases for the same).

In *Aetna*, the Fifth Circuit, applying Florida law, held that an indemnity agreement "controls the rights and obligations of the parties and their privies (the insurers)." 483 F.2d at 473. The fact that the parties purchased insurance "does not detract from or modify" an indemnity agreement, such as the one between Sun and the MDS Entities. *See id.; see also St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines, Ins. Co.,* 365 F.3d 263, 272 (4th Cir. 2004) ("all indications are that most, if not all, jurisdictions to have faced the question of whether an indemnification agreement could relieve particular insurers of an obligation to pay, without resort to a separate action enforce the indemnification agreement, have answered in the affirmative."). Sun was entitled to full indemnification by the MDS Entities, and thus Sun had no legal obligation to pay the Settlement Amount or any defense costs.

Despite this, Sun rejected indemnification for all of the damages sought here. (SOF ¶¶ 51-52.) Sun alleges that it should be "reimbursed" for the Settlement Amount, its attorneys' fees and other defense expenses, and for expenses incurred by other defendants (the Team Fees). Sun seeks coverage for these costs under the Policy, even though none of these sums would have been Sun's responsibility had it accepted indemnification. By doing so, Sun increased the potential exposure of Twin City under the Policy, thereby causing the failure of a condition

---

[13] Decisions of the former Fifth Circuit rendered prior to close of business on September 30, 1981, are binding in this circuit. *See Bonner v. City of Pritchard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981).

precedent to coverage under the Excess Policy.  (SOF ¶¶ 14-15; "as a condition precedent to coverage, … the **Insureds** [] agree that they shall not take any action which in any way increases the **Insurer's** exposure under this policy.").

    **2.      Sun's Failure to Comply with a Condition Precedent Bars Coverage.**

    Sun's failure to comply with a condition precedent of coverage is "a material breach barring recovery."  *Swaebe v. Fed. Ins. Co.,* 374 F. App'x 855, 857-58 (11th Cir. 2010) (affirming grant of summary judgment to insurer under Florida law where insured failed to comply with conditions precedent of the insurance contact); *see also E. Baby Stores, Inc. v. Cent. Mut. Ins. Co.*, No. 07 CIV. 3890 (LAP), 2008 WL 2276527 *2 (S.D.N.Y. June 2, 2008) (granting summary judgment to insurer under New York law and holding that the insured's failure to comply with the insurance policy's notice provision constituted "a failure to comply with a condition precedent which, as a matter of law, vitiates the contract.").

    Had Sun not rejected indemnification, Twin City would have had no exposure to loss whatsoever.  After refusing indemnification, Sun alleges that it should be allowed to recover over $20 million in third party payments toward the Settlement Amount. Even if Sun could take credit for these sums, it cannot reject indemnification to which it was entitled and then seek recovery for damages it would not have incurred but for its breach of the Policy. Having breached the insurance contract here at issue, Sun is barred from recovery of the Settlement Amount and all other damages it seeks to recover under the Policy as a matter of law. *Swaebe*, 374 F. App'x at 857-58; *E. Baby Stores*, 2008 WL 2276527 at *2.

**C.      Sun Separately is Barred from Coverage by Releasing
        Twin City's Subrogation Rights**

    If Sun were to establish a legitimate basis upon which Twin City was obligated to make a payment of Loss (which it has not), Twin City would be entitled under its insurance contract to all rights of subrogation of any claims that Sun would have against any third parties that might have obligations to Sun for the Loss.  Here, Sun released the parties against which it had claims for indemnity, thereby irrevocably impairing Twin City's subrogation rights, and breaching the Policy in a manner that bars any recovery by Sun.

    The MDS Entities were responsible for payment of any obligation Sun might have for the Fraudulent Transfer Action pursuant to contractual indemnification. (SOF ¶ 46.) The MDS Entities acknowledged that they were required to indemnify Sun pursuant to the indemnification clauses in the MDS Operating Agreements. (SOF ¶¶ 47-50.)  (In fact, the MDS Entities did pay Sun's purported Settlement Amount. (SOF ¶¶ 76, 83, 90.)).

    The requirement to preserve Twin City's rights of subrogation are stated in the Primary Policy as follows:

The **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable the insurer effectively to bring suit in their name, and shall provide all of the assistance and cooperation which the Insurer may reasonably require.

(SOF ¶ 16.) Moreover, The Policy states that Sun "shall do nothing that may prejudice the Underwriters' position or its potential or actual rights of recovery." (SOF ¶ 15.)

To the extent that Sun claims an obligation by Twin City to pay the amounts of any Settlement Agreement, Twin City would have a corresponding right to claim those same amounts by subrogation against the MDS Entities under the various indemnification agreements. But Twin City cannot do that, because Sun already gave away those rights; the Sponsor Group Settlement Agreement specifically released the MDS Entities from any claim of any kind in exchange for the payments made by the MDS Entities. (SOF ¶ 96.)

Section 14 of the Sponsor Group Settlement Agreement states that all parties to the Agreement are released from all claims "in any way arising out of, or relating to, (i) the Debtors, (ii) the MDS Entities and/or (iii) the Litigations (or the facts alleged in the FD Action or the Pref Action"). *Id.* Therefore, any rights or claims that Sun held against the MDS Entities relating to the Fraudulent Transfer Action were discharged when Sun signed the Sponsor Group Settlement Agreement. Twin City's subrogation rights were thus extinguished.

This is hardly surprising because, in fact, the MDS Entities made the payments. A party that pays a settlement expects be released from further payments. The MDS Entities would not have agreed to pay Sun's Settlement Amount if they were exposed to further loss for the Fraudulent Transfer Action. But in this case, even though Sun's obligations were paid by someone else and Sun sustained no Loss, it wants to be indemnified twice through this claim against Twin City. Because Twin City's rights to subrogation have been released, however, Sun has no coverage for the "paper" loss Sun is claiming related to the Fraudulent Transfer Action.

The Primary Policy states that "No action shall lie against the Insurer unless, as a condition precedent thereto, the Insureds have fully complied with all of the terms of this Policy, . . .." (SOF ¶ 17.) Because Sun breached conditions precedent to bringing its action against Twin City, its claim for "indemnification," "liability," or any other representation of the Settlement Amount must fail.

## IV.  CONCLUSION

For the reasons set forth above, Twin City is entitled to judgment as a matter of law on Sun's claims for payment by Twin City of the Settlement Amount or any part of it. Sun did not pay and had no obligation to pay the Settlement Amount in the Underlying Action. Moreover, because Sun refused to accept full indemnification for the Settlement Amount and released Twin City's subrogation rights, Sun is barred from recovery of any of the damages it seeks under the

106268127.1

Excess Policy. Twin City, therefore, respectfully moves this Court to enter judgment for Twin City and against Sun on all of Sun's claims for Loss relating to the underlying case settlement and its purported settlement payment.

      Dated this <u>1st</u> day of April, 2016.

<div style="margin-left: 40%;">

*/s/ David J. Forestner*
David J. Forestner
Florida Bar No. 0371040
David M. Leonard (*admitted pro hac vice*)
Georgia Bar No. 446625
Justan C. Bounds
Georgia Bar No. 339789
CARLTON FIELDS JORDEN BURT, P.A.
One Atlantic Center
1201 West Peachtree Street
Suite 3000
Atlanta, Georgia   30309
Telephone:    (404) 815-3400
Facsimile:    (404) 815-3415
Email: dforestner@carltonfields.com
      dleonard@carltonfields.com
      jbounds@carltonfields.com

Joseph Ianno, Jr.
Florida Bar No. 655351
CARLTON FIELDS JORDEN BURT, P.A.
CityPlace Tower
Suite 1200
525 Okeechobee Boulevard
West Palm Beach, Florida  33401
Telephone:    (561) 659-7070
Facsimile:    (561) 659-7368
Email:  jianno@carltonfields.com

***Attorneys for Defendant***
***Twin City Fire Insurance Company***

</div>

106268127.1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 1, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List *via* transmission of Notice of Electronic Filing generated by CM/ECF.


*/s/ David J. Forestner*
David J. Forestner

106268127.1

## <u>SERVICE LIST</u>

*Sun Capital Partners, Inc. v. Twin City Fire Insurance Company*
Case No.:  12- 81397-CIV-MARRA/MATTHEWMAN
United States District Court, Southern District of Florida

R. Hugh Lumpkin, Esq.
hlumpkin@vpl-law.com
Arya Attari, Esq.
aattari@vpl-law.com
Tiffany C. McCaffery, Esq.
tmccaffery@vpl-law.com
Christopher T. Kuleba, Esq.
ckuleba@vpl-law.com
Ver Ploeg & Lumpkin, PA
100 S.E. 2nd Street
Thirtieth Floor
Miami, FL  33131-2151
Phone: 305-577-3996
Fax: 305-577-3558

Michael R. Delhagen, Esq.
Co-Counsel for Twin City Fire
Tressler LLP
One Penn Plaza
Suite 4701
New York, NY 10119
Telephone: 646-833-0900
Email:  mdelhagen@tresslerllp.com

106268127.1